**Eule FORD, Appellant,**

v.

**Leatrice J. DOWD; Alvin J. Wilson; City of Pagedale, Missouri, Appellee.**

No. 88–2782.

United States Court of Appeals,
Eighth Circuit.

Resubmitted Aug. 14, 1990.

Decided May 1, 1991.

Rehearing and Rehearing En Banc
Denied June 28, 1991.

Donna Aronoff Smith, St. Louis, Mo., for appellant.

Fran Susman, St. Louis, Mo., for appellee.

Before JOHN R. GIBSON, Circuit Judge, WOLLMAN, Circuit Judge, and BROWN,* Senior Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge:

Ford appeals the district court's grant of summary judgment to the City and Wilson in this 42 U.S.C. § 1983 suit for damages allegedly resulting from the defendants' requirement that Ford submit to a drug urinalysis test. 697 F.Supp. 1085. We find that the testing was neither routinely nor randomly applied and that the defendants did not have adequate reason to suspect Ford of drug use. Therefore, we reverse.

### Malice in Pagedale

Eule Ford was a police officer with the City of Pagedale, Missouri, Police Department. Prior to this lawsuit, he had been employed there since 1981. In 1985, Ford was appointed Pagedale's Acting Chief of Police. Following that, in April 1986, Leatrice Dowd was elected Mayor of Pagedale. Alvin Wilson succeeded Ford as permanent Chief of Police in December, 1986.

Up until the time of Mayor Dowd's taking office, no disciplinary actions had ever been instituted against Ford. However, as

---

* The Honorable John R. Brown, Senior Circuit Judge for the Fifth Circuit Court of Appeals, sitting by designation.

Mayor, Dowd brought several disciplinary actions against Ford and actually fired him on several occasions. Dowd's threats to terminate Ford often corresponded to Ford's refusal to honor the Mayor's rather suspect demands. For instance, on one occasion Dowd fired Ford because he refused to violate police department regulations and supply the Mayor with a police vehicle for her personal use. Each time Dowd fired Ford the Pagedale Board of Alderpersons (the Board) overturned the Mayor's act.

In conjunction with his appointment as Acting Chief, Ford received the salary of a lieutenant. He understood that this constituted a permanent promotion to lieutenant, and that he would remain a lieutenant once a permanent Police Chief was found. However, when Chief Wilson was appointed in December 1986, Ford was returned to the position of patrolman and began to receive a salary which reflected this rank. Ford requested that Mayor Dowd schedule a meeting for him before the Board to contest this action, which he viewed as a demotion. Dowd responded with a caustic letter stating that Ford was not entitled to a hearing before the Board and could resign if he was unhappy with her actions. The Board nevertheless scheduled a hearing for Ford on January 26, 1987.

On the same day, after the hearing was postponed, Mayor Dowd issued an order directing Ford to undergo urinalysis testing. The next day, Ford was called into Chief Wilson's office where Wilson handed Ford the Mayor's written order (the Order). The Order stated that Ford's failure to comply would result in "serious disciplinary actions." Ford assumed that he would be fired if he failed to undergo the urinalysis. Dowd had related to Chief Wilson that she had heard allegations that Ford was associating with a reputed drug dealer, Robert Wood, which she took to mean that Ford was involved in "some type of illegal drug use and/or abuse," according to the Order. At his meeting with Ford, Wilson told Ford that he did not

know the specifics of the allegations against the officer.

Chief Wilson told Ford to report to the office of a Pagedale physician that morning at 10:00 a.m. to give the urine sample. Wilson personally made the appointment for Ford. Ford went to the doctor's office and provided a urine sample with the doctor present in the room while the sample was being given. All test results on the sample were negative. After the Mayor was informed of the test results, she continued to insist that Ford was involved with Wood, but never provided any specific allegations or the names of any witnesses.

Dowd's January Order was placed in Ford's personnel file.[1] Since that time Ford has left the Pagedale Police Department and has sought patrolman positions in other police departments. Despite these efforts, Ford has failed to obtain such a position. He asserts that Dowd's Order has harmed his reputation and contributes to his inability to find similar police employment in other communities.

Ford filed this suit for damages under 42 U.S.C. § 1983 naming Dowd, Wilson and the City of Pagedale as defendants. Mayor Dowd died one day prior to the filing of the suit. The district court found after limited remand from this Court that Dowd never became a party to this lawsuit, as no estate was ever opened for her. *Cf.* F.R. Civ.P. 25(a)(1). The court also found that Dowd's successor as Mayor of Pagedale is not a party to this action in either an individual or a representative capacity, as the action was not pending when Dowd died. *Cf.* F.R.Civ.P. 25(d)(1).

The district court entered summary judgment in favor of the remaining defendants Wilson and the City of Pagedale on the grounds that the urinalysis order was reasonable as a matter of law. The court did not reach the appellees' alternative arguments that Ford consented to the testing and that Wilson was protected from liabili-

---

**1.** Ironically, the record does not reveal whether the results of the drug test were placed in Ford's file.

ty by way of qualified immunity. Ford appealed.

### Standard of Review

We review the grant or denial of a summary judgment *de novo. Holloway v. Conger*, 896 F.2d 1131, 1134 (8th Cir.1990). Under this standard, summary judgment is proper only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law," *Meyer v. Barnes*, 867 F.2d 464, 466 (8th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 86, 107 L.Ed.2d 51 (1989). We rely upon the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, in resolving this question. F.R.Civ.P. 56(c). Finally, we read all facts in the light most favorable to the non-moving party and give that party the benefit of any reasonable inferences arising from the facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987).

### What We Decide

■ The principal issue before this Court is whether, in line with the Fourth Amendment prohibition against unreasonable searches and seizures, a police superintendent can require one of his officers to submit to drug testing based upon unsubstantiated rumor that the officer associated with drug dealers where there is no more specific allegation that the officer was known to have used drugs. We conclude that the Fourth Amendment does not permit such a search and reverse the district court's grant of summary judgment for the reasons assigned.

### Acceptable Drug Testing

The Fourth Amendment guards against unreasonable searches and seizures of persons by officers of the Government or those acting at their direction. *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935 (1967).[2] It is settled law that drug urinalysis testing is a search within the meaning

of the Fourth Amendment. *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 663–66, 109 S.Ct. 1384, 1390–91, 103 L.Ed.2d 685, 701–02 (1989); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617–18, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639, 660 (1989); *McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir.1987). It follows that any Government-imposed order for urinalysis testing must be reasonable. *Von Raab*, 489 U.S. at 665–66, 109 S.Ct. at 1390–91, 103 L.Ed.2d at 702; *Skinner*, 489 U.S. at 618–19, 109 S.Ct. at 1413–14, 103 L.Ed.2d at 661; *Rushton v. Nebraska Public Power Dist.*, 844 F.2d 562, 566 (8th Cir.1988).

The reasonableness of drug urinalysis testing depends upon the particular circumstances in the context in which the search takes place. The Court must balance the individual's legitimate privacy expectations against the Government's need to conduct the testing in the manner it proposes. *Von Raab*, 489 U.S. at 665–66, 109 S.Ct. at 1390–91, 103 L.Ed.2d at 702; *Rushton*, 844 F.2d at 566.

The Supreme Court and this Court have upheld drug testing where either of two sets of circumstances are present. First, urinalysis can be required where the testing is carried out under a specific plan and is applied either randomly or routinely to Government employees, or private employees tested in satisfaction of Government regulations, *Skinner, supra*, who occupy particularly sensitive positions. *E.g., Von Raab*, 489 U.S. at 676–77, 109 S.Ct. at 1396–97, 103 L.Ed.2d at 709 (customs employees); *Rushton*, 844 F.2d at 566 (nuclear power plant workers); *McDonell*, 809 F.2d at 1308 (prison security guards). Second, regardless of whether any drug testing plan is in place, a Government employer may require an employee to submit to urinalysis where the employer has reasonable, articulable grounds to suspect an employee of illegal drug involvement. This second standard requires individualized suspicion, specifically directed to the per-

---

**2.** The Supreme Court has held that the Fourth Amendment applies to police practices of state and local governments by virtue of the Due Process Clause of the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691–92, 6 L.Ed.2d 1081, 1090 (1961).

son who is targeted for the urinalysis test. *McDonell,* 809 F.2d at 1307; *Hunter v. Auger,* 672 F.2d 668, 675 (8th Cir.1982).

As this Court made clear in *McDonell,* a Government cannot, in either of these two situations, enforce drug testing in a discriminatory manner. There we held that selection for testing pursuant to a random or routine plan must not be arbitrary, and that testing on account of a reasonable suspicion that an employee uses or abuses illegal drugs must be based on more than mere hunches or predispositions toward the employee. In the Court's language:

> [U]rinalyses may be performed uniformly or by systematic random selection ... [which] *must not be arbitrary or discriminatory.*
>
> Urinalysis testing ..., other than uniformly or by systematic random selection of those employees so designated, may be made only on the basis of a reasonable suspicion, based on *specific objective facts* and reasonable inferences drawn from those facts [that, as involved in that case, the employee is a drug user].....

*McDonell,* 809 F.2d at 1308 (emphasis added).

### Why Summary Judgment Was Improper

With its decisions in *Von Raab* and *Skinner,* the Supreme Court relaxed requirements for urinalysis testing of persons who have the protection of the Fourth Amendment and who are employed in certain critical, safety-sensitive positions. *See Von Raab,* 489 U.S. at 668–70, 109 S.Ct. at 1392, 103 L.Ed.2d at 704; *Skinner,* 489 U.S. at 632–34, 109 S.Ct. at 1421–22, 103 L.Ed.2d at 670. The Court held that in certain situations the Government's interest in conducting suspicionless searches outweighs the privacy expectations of these critical employees. *Id.* As a result, where certain safeguards are present, the Government agency may broadly impose drug testing programs without requiring individualized suspicion directed toward the particular employees who are to be tested. *See id.*

Appellees Wilson and Pagedale argue that police officers, like customs and railway employees, *see Von Raab* and *Skinner, supra,* enjoy a diminished expectation of privacy because, if impaired by drugs, they would present a serious danger to themselves and to the community. Additionally, a municipality does not expect its law enforcement officers to engage in lawbreaking. Appellees also argue that summary judgment was proper here because, in light of *Von Raab* and *Skinner,* Mayor Dowd and Chief Wilson were not required to have a reasonable suspicion that Ford used drugs before ordering that he be tested.

■ We agree that police officers such as Ford fit within the safety-sensitive employee category. These critical Government employees carry firearms and drive emergency vehicles and are therefore sensitively situated, just as are prison employees, *see McDonell, supra.* In view of the threat present when such an employee is inhibited by drugs or alcohol or is otherwise not fully capable of performing his or her duties, the Government has a legitimate interest in assuring that such an employee is drug- and alcohol-free. *See id.* at 1308. Despite the compelling nature of the Government interest, however, we are unwilling to read *Von Raab* and *Skinner* to mean that the Government need not observe *any* safeguards in instituting drug testing of such employees.

With *Von Raab* and *Skinner* the Supreme Court decided the question whether reasonable individualized suspicion was always necessary before the Government could require urinalysis testing of one of its employees, or a private employee tested pursuant to Government regulations. The Court determined in these two decisions that individualized suspicion does not represent the constitutional floor beneath which a drug testing search would not be permitted. *Von Raab,* 489 U.S. at 665–66, 109 S.Ct. at 1390–91, 103 L.Ed.2d at 702; *Skinner,* 489 U.S. at 623–24, 109 S.Ct. at 1416–17, 103 L.Ed.2d at 664. In the context of

the particular Government agencies involved there, the Court held:

> ... [W]here the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.

*Skinner,* 489 U.S. at 623–24, 109 S.Ct. at 1416–17, 103 L.Ed.2d at 664.

A careful look at the elements of the urinalysis testing measures in *Von Raab* and *Skinner* reveals that the routine nature of the particular plans in these cases minimized their intrusiveness and guarded against their arbitrary application to tested employees. Under the *Von Raab* drug testing program, the Customs Service tested each and every employee who sought employment in a sensitive position.[3] Likewise in *Skinner,* Federal Railroad Administration regulations mandated post-incident urine tests of employees who were directly involved in either of two types of train accidents.[4] In each of these cases all employees who met certain criteria related to the Government interest in safety were affected by the drug testing plans: testing was a uniform prerequisite to employment in sensitive areas in *Von Raab* and a part of railway accident investigation procedure in *Skinner.*

This Court upheld a similar drug testing program in *Rushton, supra,* where Nebraska public nuclear power plant employees challenged the reasonableness of their employer's random drug and alcohol testing program. Quoting the Fifth Circuit's

opinion in *Von Raab,* 816 F.2d 170, 176 (5th Cir.1987), we determined that the *random* program in place there was a reasonable alternative to individualized suspicion. *Rushton,* 844 F.2d at 567.

The District of Columbia Circuit reached a similar result in *Jones v. McKenzie,* 833 F.2d 335 (D.C.Cir.1987), which appellees cite for the proposition that Ford was properly subjected to testing because, as a Government employee responsible for the physical safety of others, his expectations of privacy are somewhat diminished. In that case, however, the court upheld suspicionless drug testing of bus attendants especially because the testing was routinely carried out. The court stated:

> ... [T]his case involves only testing that is conducted as part of a routine, reasonably required, annual medical examination. This has the effect of ensuring that the intrusion on the employee's privacy is minimized.

*Id.* at 340.

■ The contexts of these cases contrast sharply with the situation present here. While police officers enjoy a diminished expectation of privacy because of the importance of their position in society, it is clear that the action taken by Dowd and Wilson shows no respect for the safeguards present in *Von Raab, Rushton,* and the other cases cited above: Ford was not selected for urinalysis testing according to a random or routine program which guarded against discriminatory or arbitrary selection of employees to be tested.[5] Conse-

---

3. The Court upheld testing of employees in or seeking transfer to positions directly involving the interdiction of illegal drugs or the carrying of a firearm, *Von Raab,* 489 U.S. at 669–71, 109 S.Ct. at 1393, 103 L.Ed.2d at 705, and remanded for further findings regarding the reasonableness of the testing program insofar as it covered employees required to handle "classified material." *Id.* at 676–77, 109 S.Ct. at 1396–97, 103 L.Ed.2d at 709.

4. The regulations require blood and urine testing following either a "major train accident" as defined within the regulations, or "[a]ny train incident that involves a fatality to any on duty

railroad employee." 49 CFR § 219.201(a) (*cited in Skinner,* 489 U.S. at 608–11, 109 S.Ct. at 1408–09, 103 L.Ed.2d at 654–55).

5. Wilson and Pagedale halfheartedly argue that the policy statement which Ford placed in the "General Orders" notebook of the Pagedale Police Department while he served as Acting Chief of Police constituted Pagedale's drug testing program at the time Ford was summoned for testing. Ford received a copy of the program, entitled "General Order 86-_____," from another police department. Along with authorizing routine and random testing of certain police officers, the policy provides that drug testing of police officers would be ordered where, *inter*

quently, as this Court held in *McDonell*, in the absence of uniform or systematic random selection of employees subject to drug testing, we will allow the Government to enforce drug testing where employees are chosen *"only* on the basis of a reasonable suspicion." 809 F.2d at 1308 (emphasis added).

We now turn to the question whether Dowd and/or Wilson reasonably suspected Ford of drug use before ordering him to submit to urinalysis. Mayor Dowd ordered Ford to submit to a urinalysis test after receiving tips that Ford was involved with a known drug dealer. Appellees Wilson and Pagedale assert that these rumors, coupled with anonymous phone calls Wilson received to the same effect, provided adequate basis for a reasonable suspicion that Ford used illegal drugs.

█ The standard of reasonable suspicion is not difficult to meet, and in any event is a lesser standard than probable cause. *See Von Raab,* 489 U.S. at 665–66, 109 S.Ct. at 1390–91, 103 L.Ed.2d at 702. We have stated that we will tolerate reasonable suspicion strip searches and urinalysis testing of certain prison security

guards where prison officials can point to "specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience" that the guards are inhibited from fully performing their duties because of drug or alcohol use. *See McDonell,* 809 F.2d at 1307–09. We applied the same standard to prison visitors suspected of smuggling contraband into prisons in *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).[6] However, we cannot conclude without further development of the facts that Pagedale officials' decision to order that Ford be tested was based on a reasonable suspicion that Ford used drugs.

It is undisputed that Dowd was negatively predisposed toward Ford. Within the six-month period preceding her drug testing order, Dowd fired Ford twice only to have the Board of Alderpersons countermand her act both times.[7] She accused Ford of evils ranging from unkempt appearance to bringing shame and disgrace to the Criminal Justice System as a whole.[8] Finally, on the same day that Ford contested yet another of Dowd's official actions

---

*alia,* "the allegation involves the use, possession or sale of drugs or narcotics."

In his deposition, Ford described the normal procedure for the City to implement such a program:

Q: What was the procedure for approving the General Orders book?

A: Okay. After I get my General Orders book together, at a scheduled personnel meeting, I would give a copy to each board member to go through and read it. They would give me their approval and then I would implement it.

Q: You didn't have a chance to implement this?

A: No.

Appellees do not dispute that Ford received the model policy from another police department and that it was never acted upon by the Board of Alderpersons. Nor do they deny that Board consideration is a prerequisite to such a policy's taking effect. Finally, they proffer no evidence that any Pagedale administration has implemented the program's routine or random testing components, or the reasonable suspicion component *as to anyone other than* Ford. Consequently we cannot conclude as a matter of

law that the model order became Pagedale's official policy simply by virtue of Ford's placing it in the General Orders notebook. Even if the proposed General Order did constitute Pagedale Police Department policy, a genuine issue exists as to whether the city followed its procedure in applying it to Ford.

**6.** *Citing Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968); *United States v. Clay,* 640 F.2d 157, 159 (8th Cir.1981); and others.

**7.** In October, 1986, after the Mayor attempted to fire Ford the second time, the Board reversed her order and informed Ford that in the future he should not step down unless he heard directly from the Board that he had been terminated. In its letter to Ford, the Board wrote:

Be advised you are to perform your standard duties as Acting Chief of Police and are to continue to perform said duties without interruption, *unless you are notified by the Board, in writing*!

Letter of Pagedale Board of Alderpersons to Acting Police Chief Ford, October 17, 1986, (emphasis in original).

**8.** Dowd Letter to Ford, Dec. 30, 1986.

before the Board,[9] Dowd issued the Order for Ford to submit to urinalysis testing. Ford received Dowd's written Order the next morning.[10]

Wilson testified in his deposition that Dowd stated that she made the order on the basis of information that Ford was associating with a reputed drug dealer. Wilson testified that Dowd refused his requests for the names of Ford's accusers and more specific information regarding Ford's alleged activity with drugs. That is, Dowd did not reveal whether from the rumors she had heard she had reason to believe Ford was taking payoffs, buying, selling, or using drugs. Wilson also stated that he would have required further investigation, including possibly bringing forward actual witnesses to Ford's activities, before requiring Ford to submit to urinalysis, but went ahead with the Order on Dowd's instructions.[11] Wilson felt this way although he contended that he had received anonymous phone calls naming Ford as being involved with a known drug dealer.

Rumors which form the basis of testing of a Government employee must allege or at least permit a reasonable inference that the employee used drugs. *McDonell*, 809 F.2d at 1308. Wilson states that Dowd based her order on rumors that Ford associated with a known drug dealer. Not one of the rumors which Wilson asserts he heard second-hand from Dowd or directly from anonymous phone callers included the allegation that Ford was known to have *used* drugs. Allegations that a police officer is involved with a drug dealer might, in some circumstances, give rise to a reasonable suspicion of substantial drug involvement, including likely indications that the officer takes payoffs from drug dealers whom he should be working against, or even that the officer sells drugs.[12] However, the unsubstantiated rumors which Dowd, and Wilson, perhaps under pressure, relied upon here do not, without more, provide an adequate basis for the Mayor's order. *See also Wrightsell v. City of Chicago*, 678 F.Supp. 727, 733 (N.D.Ill.1988) (information that police officer associates with drug dealers does not rise to the level of reasonable suspicion of drug use).

We conclude from the depositions and other material, therefore, that the basis for Dowd's order was neither specific, as Wilson as much as admitted in his deposition, nor completely objective, considering

9. Ford went before the Board to contest Dowd's decision to revoke his lieutenant's salary after he stepped down from the position of Acting Police Chief in November, 1986. *See supra* pp. 1287–1288.

10. The letter from Mayor Dowd, dated January 26, 1987, reads in part:

... [A]llegations have been made indicating that you may be involved in some type of illegal drug use and/or abuse.

\* \* \* \* \* \*

... [Y]ou are hereby ordered to submit to a urinalysis test on January 27, 1987, at 10 a.m. Your failure to do so will result in serious disciplinary actions.

As you know, you have the right to a Board hearing after submitting to the testing. If you refuse, you may also request a hearing by the Board.

11. Wilson testified at his deposition:

Q. That [the order] didn't necessarily meet with your personal approval?
A. I felt that we could, she could have did more investigation, brought more people forward. I would have liked, you know, to have her bring witnesses forward and things of that nature.

\* \* \* \* \* \*

Q. Okay. Did you try and talk her out of ordering this drug screening test?
A. I informed her that a more extensive investigation should be done, you know, and I reiterated with her numerous times that more information should be gathered prior to the drug screening. And, at that point, she, you know, ordered me to schedule the drug testing, and I think it was very hairy when she ordered me to.

12. This situation is distinguishable from the case of *Everett v. Napper*, 833 F.2d 1507 (11th Cir.1987), where a firefighter was suspended and then fired after he refused to submit to a urinalysis test. In that case, Hodges, a confirmed drug dealer and fellow firefighter of Everett named Everett as one of his customers. The Eleventh Circuit determined that the City had reason to suspect Everett of drug use because the allegation was that Everett bought drugs and because they deemed Hodges to be a reliable source of information. In contrast, the charges against Ford originate from no named source and are not nearly as specific as the rumors in *Everett*.

Dowd's predisposition toward Ford.[13] For these reasons, we conclude that the summary judgment holding that Ford was reasonably ordered to submit to a drug test was erroneous. A remand for trial is required.

### Consent and Qualified Immunity

As for the alternative issues of consent and qualified immunity, these are open to the district court's consideration as the facts are further developed upon remand. Without foreclosing the court's independent action, we offer the following relevant observations.

■ First, appellees argued below and assert in their briefs that Ford is estopped from claiming that he was unreasonably forced to submit to urinalysis because he waived his right to a Board hearing and, instead, acquiesced in being tested. In support of this contention they quote from this Court's decision in *McDonell:* "A legal search conducted pursuant to voluntary consent is not unreasonable and does not violate the Fourth Amendment." 809 F.2d at 1310. We reaffirm this rule today but emphasize that the consent must be voluntary and not coerced by the Order which Ford challenges.

■ *McDonell* also made clear that a Government employer cannot require that an employee consent to an unreasonable drug search at the risk of the employee's losing his or her job: "Consent must be given voluntarily and without coercion determined from the totality of the circumstances." *Id.* (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854, 862–63 (1973)). The district court must bear these principles in mind on remand in determining whether there is sufficient evidence to

raise a genuine issue of fact as to the voluntariness of Ford's decision to submit to an unreasonable search.

■ Finally, as a Government official Wilson is entitled to qualified immunity for discretionary acts he performs if, at the time of his conduct, it was not "clearly established" that his actions would violate Ford's constitutional rights. *Arcoren v. Peters*, 829 F.2d 671, 673 (8th Cir.1987). On the other hand, as we stated in *Arcoren*, the qualified immunity defense fails where the official acts in a manner that disregards undisputed constitutional guarantees. *Id. See also, Anderson v. Creighton*, 483 U.S. 635, 637–41, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523, 529–31 (1987) The asserted defense of qualified immunity is open to Wilson on remand, but, guided by these principles, the lower court must decide whether Wilson's act was of the sort that makes the defense of qualified immunity available to him.

### Conclusion

For the foregoing reasons, we reverse the district court's grant of summary judgment and remand the case for proceedings consistent with this opinion including consideration of the issues of consent and Wilson's qualified immunity.

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent. The record in this case is clear that Mayor Dowd and Chief Wilson had received rumors that Ford was involved with drug dealers. Wilson received anonymous calls that Pagedale police officers had been involved with illegal drugs and some mentioned Ford by name. Mayor Dowd received calls telling her that Ford was involved with a person named "Wood" who was a known drug dealer.

---

**13.** We do not mean to imply that a supervisor can never satisfy the "specific, objective facts and reasonable inferences" requirement where she is negatively predisposed to the employee she orders to submit to testing. However, in these circumstances, where Dowd drafted the order closely on the heels of another of Ford's attempts to have the Board overturn her, and since she refused to substantiate her rumors, Dowd's action did not satisfy this element of the *McDonell* test.

Ford admitted that rumors of his involvement with illegal drugs were prevalent.

Ford, as a police officer, was subject to call 24 hours a day and carried a firearm. Under these circumstances I do not believe that the recent decisions of the Supreme Court require reversal. The City had compelling governmental interests with respect to Ford's use or nonuse of drugs, both from the standpoint of his integrity and judgment and his capability to use deadly firearms. As Ford has admitted that rumors of his involvement with illegal drugs were prevalent, I believe it was permissible to obtain the drug screen test, and I would affirm the entry of the summary judgment.