Second Division

June 23, 1998

No. 
1-96-1807 & 1-97-0094 (Consolidated)

MATT RODRIGUEZ, Superintendent of Police of the City of Chicago,

Plaintiff-Appellee,

v.

JAMES BAGNOLA and the POLICE BOARD OF THE CITY OF CHICAGO,

Defendants-Appellants.

____________________________________________________

JAMES BAGNOLA,

Plaintiff-Appellant,

v.

MATT RODRIGUEZ, Superintendent of Police of the City of Chicago, and POLICE BOARD OF THE CITY OF CHICAGO,

Defendants-Appellees.

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County.

Honorable

Edwin W. Berman & Lester D. Foreman,

Judges Presiding.

JUSTICE TULLY delivered the opinion of the court:

Matt Rodriguez, Superintendent of Police of the City of Chicago ("Superintendent"), filed administrative charges against James Bagnola ("Bagnola") seeking to discharge Bagnola from his position as a Chicago police officer for knowingly possessing cocaine.  Initially, on March 11, 1993, the Police Board of the City of Chicago ("the Board") dismissed the charges and ordered that Bagnola be reinstated with back pay.  The Superintendent brought a complaint for administrative review to the circuit court of Cook County, naming Bagnola and the Board as defendants.  The circuit court vacated the Board's decision and remanded the matter for an administrative hearing.  Bagnola filed a motion to dismiss the administrative review appeal, which the circuit court denied.  Bagnola appealed to this court under docket number 1-96-1807.  While the first appeal was pending, the Board found Bagnola guilty of the charges upon remand, and ordered him discharged.  Bagnola appealed the Findings and Decision of the Board to the circuit court of Cook County, and the circuit court affirmed the Board's rulings.  Subsequently, Bagnola appealed under docket number 1-97-0094.  Both appeals were consolidated.  Jurisdiction is vested in this court pursuant to Supreme Court Rule 301 (155 Ill. 2d R. 301). 

FACTUAL HISTORY

The pertinent facts are as follows.  James Bagnola was a Chicago police officer since 1973.  On July 19, 1991, the Chicago Police Department ("Department") received information from Bagnola's sister and wife that he was using cocaine on a daily basis and became "a maniac."  Consequently, the Department ordered Bagnola to report to the Medical Services Section to submit two urine samples for a drug analysis.  At that time, Bagnola was scheduled to begin a three-week vacation.  

 Bagnola reported to the Department's medical services section and submitted two urine specimens, one of which was immediately sent to SmithKline Beecham Clinical Laboratories ("the SKB lab"), which performs all the urinalysis for the Department.  The specimens were taken 35 minutes apart because Bagnola needed to drink more fluids to get a second specimen.  On July 20, 1991, the Department and Bagnola were informed that the first specimen tested positive for cocaine metabolite benzoylecgonine ("BZE") at a level of 111,372 ng/ml.  According to Bagnola, an unidentified individual told him that he could send the second urine specimen to a laboratory of his choice for independent testing, but only if the laboratory were within a 60-mile radius of the City of Chicago and its results could be given to the Department within a 48-hour period.  Out of three laboratories, only one, the SKB lab, could return the results within 48 hours.  Therefore, in September 1991, Bagnola sent the second specimen to the SKB lab, which also tested positive for BZE at a level of 16,322 ng/ml.  It is undisputed that Bagnola was not advised that he had the right to counsel nor was he advised of his administrative proceeding rights in writing.          

The Superintendent filed charges against Bagnola on September 4, 1992 for violating the following rules:

"RULE 1:  Violation of any law or ordinance.

RULE 2: Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department.

RULE 6: Disobedience of an order or directive, whether written or oral."

In response, Bagnola filed a motion to dismiss based on a failure to comply with the requirements contained in section 10-1-18.1 of the Illinois Municipal Code (Ill. Rev. Stat.1991, ch. 24, par. 10-1-18.1 (now 65 ILCS 5/10-1-18.1 (West 1996))) and section 2-84-030 of the Chicago Municipal Code (Chicago Municipal Code §2-84-030 (1990)).  The Board dismissed the charges on March 11, 1993 based on the appellate court's ruling in 
Corgiat v. Police Board of the City of Chicago
, 241 Ill. App. 3d 1, 612 N.E.2d 1343 (1992), which held that a police officer must be advised of statutory administrative rights, including the right to counsel, before a police officer submits a urine sample.  The Superintendent filed a complaint for administrative review in the circuit court of Cook County, naming Bagnola and the Board as defendants.  While that matter was pending, the Illinois Supreme Court reversed the 
Corgiat
 decision, and held that administrative warnings do not have to be issued before an officer is ordered to submit a urine sample, nor will a urinalysis test be considered an examination.  
Corgiat v. Police Board of the City of Chicago
, 155 Ill. 2d 384, 612 N.E.2d 1232 (1993).  Based on that ruling, the circuit court vacated the Board's ruling and remanded for an administrative hearing on the merits.  Bagnola filed a motion to dismiss the administrative review appeal, which the circuit court denied.  Bagnola appealed. 

At the evidentiary hearing, the chain of custody was established.  Sergeant Thomas Tranckitello of the Internal Affairs Department went with Bagnola to the Random Drug Testing Unit to take a drug screening test.  Officer Anna Hanley was working at the unit and checked Bagnola's identification.  Sergeant Tranckitello took Bagnola to the restroom and witnessed Bagnola provide the urine specimen, and give it to Officer Hanley.  Officer Hanley completed the paperwork, placed the urine sample into a bottle and sealed it with tape.  She then placed the bottle into a tamper proof bag, sealed it and labeled it.  Bagnola signed an affidavit stating that he had witnessed Officer Hanley's procedure, and then initialed and dated the bag.  The urine specimen was sent to the SKB lab.  

Officer Hanley informed Bagnola that another sample was needed and to get something to drink.  Half an hour later, Bagnola provided another specimen and went through the entire procedure again.  Tranckitello never lost sight of Bagnola while he was providing the samples and witnessed the whole procedural paperwork.  

The first specimen ("Sample A") arrived at the SKB lab, where it was received by Maryellen Stickling, a SKB employee.  She testified that she checked the accuracy of the date, checked the identification numbers on the paperwork and on the bottle, ensured that the seal on the bottle of Sample A was intact and that no tampering had occurred.  Once Stickling finished checking these items, she fully logged in all the information into a computer.  Stickling then opened the bottle and poured a small amount into a vial and handed it to a technician to perform the actual drug screening test.  The remaining Sample A was placed in temporary storage.  

The Superintendent offered other witnesses to testify in regard to the chain of custody.  Erin McCourt Omori stated that she had reviewed and verified the test results and the chain of custody for the EMIT test screening of Sample A.  The EMIT screening test is a qualitative test and any positive result from it is presumptive for the drug that it screened for.  The EMIT screen for Sample A was positive for both opium and cocaine.  Regina Coleman testified that she was an SKB specimen processor and performed the confirmation testing on Sample A.  Next, Junko Otte, a certified scientist at SKB who has five years of experience in certifying the results of specimen tests, reviewed the litigation package for Sample A, which contained documents such as the chain of custody forms, information on the Gas Chromatography Mass Spectroscopy (GC/MS) machine for calibration and quality control, and the test results.  Otte certified that Sample A's test result was positive for BZE at a level of 111,372 ng/ml.  She explained that any amount above 150 ng/ml would be positive.  Carol Trojan was offered as an expert in toxicology.  Trojan is a certified scientist at SKB for four years and testified that she had reviewed Sample A's litigation package, reviewed the initial test results and the confirmation test results.  She explained EMIT screening tests were conducted to detect whether the urine contained certain substances.  Trojan had found that Sample A tested positive for BZE and codeine.

Trojan further testified that Sample B was received by SKB on September 13, 1991.  An EMIT screening and a GC/MS test were performed, and both yielded a positive result for cocaine metabolites and opiates at a level of 16,322 ng/ml of BZE and 773 ng/ml of codeine.  She explained that the results differed because the samples were from different voids, or two separate acts of urination approximately 30 minutes apart on the same day.  Other witnesses who testified in regard to Sample B were Sergeant Wayne Hovland and Sergeant Christine Kolman.  Sergeant Hovland worked at the Random Drug Testing Unit and was contacted by Bagnola to have the second specimen ("Sample B") tested at the SKB lab.  Sergeant Kolman also worked in the Random Drug Testing Unit and was present when Sample B was sent to the laboratory for testing.   

Otte recounted that she had discarded Bagnola's urine specimens in February of 1994 as part of SKB's policy of discarding positive specimens 13 months or older.  Trojan explained at the hearing that it was not until 1995 that she discovered that the SKB lab should have retained all positive specimens for three years.  Trojan testified that she had not been aware of any pending litigation.

Bagnola then put five character witnesses on the stand and testified on his own behalf.  Officer Bagnola testified that he had somewhere between 100 and 150 honorable mentions although only 47 were recorded officially.  He admitted that he had a drug problem in 1988 for which he sought treatment and had drinking problems in 1991, at which time he went to an alcohol rehabilitation center.  Bagnola emphatically stated that he did not use cocaine in July of 1991 and believed that the positive drug test results were a mistake or possibly that his wife put cocaine in his food and he unknowingly ingested it, causing the test results to come out positive.  He explained that he was going through a "very rocky and ugly marriage breakup" and his wife did not want him to have custody of their child.  In his testimony, Bagnola admitted that he could not recall who told him that his second urine specimen result needed to be given to the Department within 48 hours. 

Bagnola presented Dr. Michael Evans as his expert witness.  Dr. Evans was a toxicologist and works as a CEO at American Institute of Toxicology, and his area of expertise is in the excretion of cocaine in the urine.  According to Dr. Evans, the test results were worthless without the procedural manuals because the manuals explained how the results were achieved.  He testified that he was unable to examine the specimen or confirm the results because samples A and B were discarded, which violated the SKB's standard of three years.  Nevertheless, Dr. Evans did state that the EMIT and the GC/MS tests done on Bagnola's samples were appropriate tests to detect the presence of cocaine, but had questions on the chain of custody, specifically that the data packet and the seal of the bottle were not documented as being intact upon receipt.   

On rebuttal, M.P. George was offered as the Superintendent's expert witness.  He had been the director of forensic toxicology at the SKB lab since 1987 and was a member of the National Institute for Drug Abuse ("NIDA") Drug Testing Advisory Board which sets the standards for drug testing by NIDA certified laboratories.  George testified that the procedural manuals were unnecessary because the documents in the litigation packets 
explained the procedures used in the test.

At the end of evidence on November 27, 1995, the hearing officer found Bagnola guilty of violating the Department rules and that he should be discharged from the Department.  The Board adopted the hearing officer's decision.  The Board determined that: (1) Bagnola was at all times a police officer employed by the Department; (2) the charges were filed in writing and that a notice was sent five days prior to the hearing on the charges; (3) Thomas E. Johnson conducted the administrative hearing on May 25, 1995, June 28, 1995, July 18, 1995, August 2, 1995 and August 31, 1995; (4) Bagnola appeared in person and through counsel; (5) the presence of benzoylecgonine (cocaine metabolite) was conclusive evidence that Bagnola illegally possessed cocaine, and thus his motion to dismiss was denied; (6) the SKB lab inadvertently discarded the urine samples, and in any event, Bagnola had a full opportunity to test the second urine specimen; (7) the Department did not have a 48-hour requirement to analyze the urine samples; and (8) Bagnola's constitutional rights were not violated in any way.  

Subsequently, Bagnola filed a complaint for administrative review in the circuit court of Cook County, which was denied.  Bagnola appealed this order and his appeal was consolidated with the prior pending appeal.   

ISSUES PRESENTED FOR REVIEW  

On appeal, Bagnola contends that:  (1) the Board's actions after remand by the circuit court were made without subject matter jurisdiction;  (2) the Board's findings were against the manifest weight of the evidence;  (3) he was prejudiced by a 14-month delay in the proceedings which constituted 
laches
;  (4) the destruction of evidence violated his due process rights under the Illinois and United States Constitutions;  (5) the search and seizure of his person and urine samples constituted Illinois and United States constitutional violations; and (6) he was denied administrative warnings under the Illinois Municipal Code which constituted a due process violation under the Illinois and United States Constitutions.  

ANALYSIS

We first address Bagnola's contention that the Board's actions after remand by the circuit court were all made without subject matter jurisdiction.  Specifically, Bagnola challenges the circuit court's jurisdiction by arguing that the Superintendent failed to name all parties of record, individual members and/or administrative agencies, when the Superintendent filed his Complaint for Administrative Review on March 22, 1993.  As a result, Bagnola requests that we vacate all the orders after March 22, 1993 and reinstate the original March 1, 1993 decision of the Board which dismissed all the charges against him and ordered him reinstated with back pay.  We deny this request.

Originally, section 3-107(a) of the Code of Civil Procedure stated that "the administrative agency and all persons, other that the plaintiff, who were parties of record to the proceedings before the administrative agency shall be made defendants."  Bagnola relied on this provision to support his argument in addition to two cases, 
Tretternero v. Police Pension Fund
, 268 Ill. App. 3d 58, 643 N.E.2d 1338 (1994), and 
Orlowski v. The Village of Villa Park Board of Fire and Police Commissioners
, 273 Ill. App. 3d 42, 652 N.E.2d 366 (1995).  Both 
Tretternero
 and 
Orlowski
 held that the individual members, or trustees, of an administrative board were "parties of record" for purposes of naming defendants in a complaint for administrative review pursuant to section 3-107(a).  
Tretternero
, 268 Ill. App. 3d at 62, 643 N.E.2d at 1340; 
Orlowski
, 273 Ill. App. 3d at 46, 652 N.E.2d at 368. 

However, we find that the newly amended version of section 3-107(a) of the Code of Civil Procedure (735 ILCS 5/3-107 (West Supp. 1997)) applies here.  The amendment was effective June 1, 1997, and announces that joinder of individual board members are no longer required to invoke jurisdiction under administrative review.  
Bunnel v. Civil Service Commission of Waukegan
, No. 2-97-0328, slip op. at 3 (March 17, 1998); 
Rhoads v. Board of Trustees of the City of Calumet City Policemen's Pension Fund
, __ Ill. App. 3d __, 689 N.E.2d 266 (1997).  Our supreme court held that a statutory amendment can be applied to an existing controversy on appeal unless doing so would interfere with a vested right.  
First of America Trust Co. v. Armstead
, 171 Ill. 2d 282, 290, 664 N.E.2d 36, 40 (1996).  A vested right was defined by the 
Armstead
 court as "a complete and unconditional demand or exemption that may be equated with a property interest."  
Armstead
, 171 Ill. 2d at 291, 664 N.E.2d at 40.  
"Where no vested rights are involved, either because they are not yet perfected or because the amendment is procedural in nature, the amendment can be applied to the existing controversy without any retroactive impact."  
Armstead
, 171 Ill. 2d at 290, 664 N.E.2d at 40; 
Bunnell
, No. 2-97-0328, slip op. at 7-8.  The amendment here was procedural in nature since failing to name an individual board member in a petition for administrative review will not deprive the court of subject-matter jurisdiction.  Seeing that no vested right exists here, we apply the amended section 3-107(a).

The newly amended section 3-107(a) now reads, in pertinent part:

"*** [I]n any action to review any final decision of an administrative agency, the administrative agency and all persons, other than the plaintiff, who were parties of record to the proceedings before the administrative agency shall be made defendants.  
No action for administrative review shall be dismissed for lack of jurisdiction based upon failure to name an employee, agent, or member, who acted in his or her official capacity, of an administrative agency, board, committee, or government entity, where the administrative agency, board, committee or government entity, has been named as a defendant as provided in this Section.
  Naming the director of agency head, in his or her official capacity, shall be deemed to include as defendant the administrative agency, board, committee or government entity that the named defendants direct or head.  
No action for administrative review shall be dismissed for lack of jurisdiction based upon the failure to name an administrative agency, board, committee, or government entity, where the director or agency head, in his or her official capacity, has been named as a defendant as provided in this Section.
"  (Emphasis added.) 735 ILCS 5/3-107(a) (West Supp. 1997).

We believe that the purpose of this amendment is "to reduce the possibility of error in naming and serving individuals who are acting in their official capacities as employees, agents, or members of the administrative agency and to avoid the harsh result of dismissing the complaint where the agency or entity has been named and served."  
Bunnell
, No. 2-97-0328, slip op. at 6.  Thus, failure to name an individual board member will no longer be fatal to the complaint.    

The Superintendent in this case named the Police Board and Bagnola as the defendants.  Under the newly amended section 3-107(a), that is sufficient.  The Superintendent's complaint will not be dismissed for lack of subject matter jurisdiction merely because the Superintendent did not name the individual police board members.  Joinder of individual board members is no longer required to invoke jurisdiction under administrative review.      

Having found that the trial court maintained subject matter jurisdiction and the orders entered after March 22, 1993 will not be vacated, we now address the merits of this appeal.  Our standard of review for a final administrative decision is governed by the Administrative Review Law (735 ILCS  5/3-101 
et
 
seq
. (West 1996)).  A reviewing court should not reverse the findings and decisions of an administrative agency unless it is against the manifest weight of the evidence. 
Abrahamson v. Illinois Department of Profession Regulation
, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992).  To reverse a decision of an administrative body, a reviewing court must "conclude that all reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all inferences in support of the finding, would agree that the finding is erroneous and that the opposite conclusion is clearly evident."  
Sheehan v. Board of Fire & Police Commissioners
, 158 Ill. App. 3d 275, 287, 509 N.E.2d 467, 475 (1987).  With regard to the findings of an administrative agency, it is established law in Illinois that such findings are 
prima
 
facie
 true and correct.  735 ILCS 5/3-110 (West 1994).   

Bagnola argues that the Board's findings were against the manifest weight of the evidence.  Specifically, Bagnola maintains that the allegedly positive results of the urinalysis are "scientifically improbable."  He states that his expert toxicologist witness, Dr. Evans, testified that the nine-fold difference between the first specimen (111,372 ng/ml) and the second specimen (16,322 ng/ml), were not physiologically possible, considering that the two urine specimens were taken only 35 minutes apart and BZE levels do not drop that quickly.  However, Dr. Evans also testified that BZE remains in the human body for approximately three days.  In addition, Bagnola contends that the Superintendent's expert witness, M.P. George, lacked experience in the study of the excretion of cocaine into the urine and was not an expert in toxicology, and that his testimony should not have been allowed as rebuttal evidence.

We believe that in essence there was a "battle of the experts."  The issue here is whether one expert witness was more credible than the other.  Bagnola undoubtedly argues that his expert witness in toxicology had substantial experience in the area of excretion of cocaine into the urine, thus, his testimony is credible, while the Superintendent's expert witness' testimony was not.  We emphasize that the Board was in the best position to settle any issues of credibility.  "It is not the court's function to resolve factual inconsistencies, nor is it the court's duty to weigh the evidence and then determine where the preponderance of the evidence lies."  
Haynes v. Police Board of the City of Chicago
, 293 Ill. App. 3d 508, 511, 688 N.E.2d 794, 796 (1997), quoting 
Launius v. Board of Fire & Police Commissioners
, 151 Ill. 2d 419, 427-28, 603 N.E.2d 477, 481 (1992).  On administrative review, neither this court nor the circuit court may reweigh the evidence or the determination of the credibility of the witnesses, which is to be made by the agency.  
Haynes
, 293 Ill. App. 3d at 511-12, 688 N.E.2d at 796-97.     

With these principles in mind, we find that the Board's ruling was not against the manifest weight of the evidence.  First, the Board found Dr. Evans' opinion - that the nine-fold difference in the BZE levels of the two urine specimens was physiologically improbable - to be unpersuasive.  We will not reweigh the evidence or determine which witness was more credible.  Thus, the Board's finding will stand.  Second, although Bagnola objected to the Superintendent's tendering of M.P. George as its toxicology expert, we agree with the hearing officer's decision that George was qualified to testify as an expert in toxicology because George: (1) was SKB's director of toxicology since 1987; (2) had reviewed thousands of urinalysis test results; (3) was a member of the NIDA (National Institute of Drug Abuse) drug testing advisory board which sets the standard for drug testing in NIDA certified labs; and (4) was constantly involved in reviewing published articles in professional journals.  The hearing officer's ruling will not be disturbed.  Third, George's reliance on hearsay evidence was generally relied upon by other experts in similar situations in reaching their conclusions, and thus, the hearing officer properly allowed him to testify about George's self-tested urinalysis, wherein he collected a first urine specimen, drank two cups of coffee and collected a second urine specimen and found a ten-fold difference in the BZE levels.  Bagnola had a chance to cross-examine George's testimony or to object to its admittance.  Interestingly, Bagnola did not question George on the basis of his conclusions or timely object to them.  The hearing officer did allow Bagnola  to have an opportunity to present a sur-rebuttal of George's testimony.  We surmise that Bagnola had ample opportunity to discredit George's testimony.  Bagnola cannot now state that his testimony was wrongly admitted or improperly considered by the hearing officer.  

In regard to the issue of 
laches
 raised by Bagnola, we do not find that a 14-month lag in the proceedings prejudiced him in any manner.  We note that there is considerable reluctance to impose the 
laches
 doctrine to the actions of public entities unless unusual or extraordinary circumstances are shown.  
Van Milligan v. The Board of Fire & Police Commissioners of the Village of Glenview
, 158 Ill. 2d 85, 91, 630 N.E.2d 830, 833 (1994).  However, this does not amount to absolute immunity from 
laches
.  Rather, 
laches
 does not apply to the exercise of governmental powers except under "compelling circumstances."  
Van Milligan
, 158 Ill. 2d at 91, 630 N.E.2d at 833.  We find that no compelling circumstances exist here.  The record reflects that the Superintendent charged Bagnola with the violation of three department rules 13 months after Bagnola underwent his urinalysis.  Bagnola states that he was prejudiced because he claims that during the 13 months, he initially subpoenaed the SKB lab to provide Sample A, but Bagnola did not follow up with SKB's non-compliance because Bagnola claims he was led to believe that the Board would dismiss all the charges against him.  Yet, the evidence shows that the urine samples were not discarded until two years after the charges were brought against Bagnola.  Bagnola had ample opportunity to subpoena Sample A before it was destroyed.  Thus, we find that Bagnola's argument fails.

We now address the constitutional issues raised.  Bagnola contends that the destruction of the urine samples after 30 months violated his due process rights (U.S. Const., amend. XIV; Ill. Const., art. I, § 2).  Specifically, Bagnola argues that the Superintendent destroyed the sole physical evidence against him.  Bagnola further argues that the destruction of both specimens took place after the order for remand was entered.

While it is unfortunate that Bagnola's expert will not have the opportunity to test Sample A, the destruction of Sample A does not rise to a constitutional violation.  Bagnola has not cited to any relevant authority that holds that a loss of evidence, possibly useful in an administrative proceeding, amounts to a denial of due process.  Instead, Bagnola relies on product liability case law which is not relevant, factually or legally, especially since the discovery rules do not apply to the Board's proceedings.  Nor has Bagnola offered any evidence that the urine specimens were destroyed intentionally or tampered with.  In the absence of any evidence of tampering with the content of the specimen tested and if a sufficient foundation has been established, the test results will be admitted. 
Martin v. Thompson
, 195 Ill. App. 3d 43, 49, 551 N.E.2d 1082, 1086 (1990).   

The record reflects that a contract existed between the SKB lab and the City of Chicago that stated all specimens that allegedly tested positive in a drug screening must be kept for a minimum of three years.  The specimens were tested in July of 1991 and destroyed in February of 1994, less than the three-year requirement.  However, the Board found that the specimens were destroyed inadvertently. Even though Bagnola subpoenaed the SKB lab to produce the specimens, the SKB employees did not recall seeing the subpoena, nor did petitioner follow-up on the noncompliance of the subpoena.  Moreover, Bagnola did have the opportunity to independently test Sample B.  Bagnola chose to send his second urine specimen to the SKB lab.  According to Bagnola, he was informed that he may send Sample B to any laboratory of his choice as long as it is within a 60-mile radius and the test results could be returned in 48 hours.  The Board determined that there is no evidence supporting such a 48-hour requirement.  In fact, Bagnola could not recall the name or the title of the person who allegedly told him about this "requirement."  In sum, Sample B, as well as Sample A, tested positive for cocaine.  We find that Bagnola's argument that he had a constitutional right to test Sample A has no merit.  On a final note, the procedural manuals should not have been destroyed.  Nevertheless, this does not amount to a violation of due process.  Accordingly, the test results were admitted and this did not violate any due process laws.     

We now turn to Bagnola's contention that the search and seizure of his person and urine specimens constituted a violation of the Fourth Amendment to the United States Constitution (U.S. Const., amend. IV) and section 6 of article I of the Illinois Constitution (Ill. Const. 1970, art. I, § 6).  Specifically, Bagnola claims that the request for a urine sample was an unreasonable search because there was no reasonable suspicion.  We disagree. 

Both these provisions provide that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures (U.S. Const., amend. IV, Ill. Const. 1970, art I, § 6).  The United States Supreme Court has declared that compelled urinalysis constitutes a search or seizure within the ambit of the Fourth Amendment.  
Skinner v. Railway Labor Executives' Association
, 489 U.S. 602, 617, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989).  Any compulsory urinalysis must be reasonable when viewed in the light of the circumstances surrounding it.  
Skinner
, 489 U.S. at 619.  The United States Supreme Court has upheld drug testing where the governmental employer has reasonable articulable grounds to suspect an employee of drug use or involvement.  
Ford v. Dowd
, 931 F. 2d 1286, 1289 (8th Cir. 1991).  Moreover, warrantless searches have been allowed where intrusions were based on either reasonable suspicion or "special needs."  
Skinner
, 489 U.S. at 619-20.  "Special needs" includes drug testing of employees in "safety-sensitive positions."  Police officers have been found to fit within the "safety-sensitive employee" category, since they carry firearms and drive emergency vehicles, and are therefore sensitively situated.  
Ford
, 931 F. 2d at 1291.  As a result, the government has a legitimate interest in assuring that such an employee is drug- and alcohol-free.  
Ford
, 931 F. 2d at 1290.  Although we are not bound by the Federal court decisions, we do believe the general principles in 
Ford
 give some guidance on this issue.

Bagnola attempts to argue that on July 17, 1991, he began his three-week vacation and was off-duty and thus was not in a safety-sensitive position.  According to Bagnola, the Department improperly ordered him to report to the Department's medical services section because it constituted an unreasonable warrantless search under both Constitutions.  We believe it would be absurd to find that Bagnola was unreasonably searched on July 19, 1991, but would have been reasonably searched two days earlier, on July 17, 1991, when he was on-duty.  We emphasize that Bagnola, a police officer, was a safety-sensitive employee and thus, it is irrelevant whether the urinalysis was performed while Bagnola was on-duty or off-duty.  For reasons that are so obvious as to not require elaboration, the public does not want a police force that uses illegal drugs.  The Department properly ordered Bagnola to proceed to the medical services section in order to take a drug test since he fell into the "special needs" exception.  We add that the Department's request was also proper because a reasonable suspicion existed in this case.  Bagnola's wife and his sister had told the Department about Bagnola's use of drugs, specifically cocaine.  Although Bagnola's sister later recanted her statements and the allegations were unsustained, it did raise a reasonable suspicion.  The Department had also been aware of Bagnola's prior participation in a drug rehabilitation program for his cocaine usage.  We conclude that under these circumstances, the Department properly requested and conducted a urinalysis test.   

Bagnola next advances his argument that he was entitled to receive administrative warnings before giving a urine sample under section 10-1-18.1 of the Illinois Municipal Code (65 ILCS 5/10-1-18.1 (West 1996)), and the failure to do so was a denial of due process in violation of the Fourteenth Amendment to the United States Constitution (U.S. Const., amend. XIV) and section 2 of article 1 of the Illinois Constitution (Ill. Const. 1970, art. I, § 2).  He further claims that he was not advised in writing of the charges against him before he was "examined."

Under section 10-1-18.1 of the Code, it states that:

"Before any * * * officer may be interrogated or examined by or before any disciplinary board, * * * the results of which hearing, interrogation or examination may be the basis for filing charges seeking his removal or discharge, he must be advised in writing as to what specific improper or illegal act he is alleged to have committed; he must be advised in writing that his admissions made in the course of the hearing, interrogation or examination may be used as the basis for charges seeking his removal or discharge; and he must be advised in writing that he has the right to counsel of his own choosing present to advise him at any hearing, interrogation or examination; and a complete record of any hearings, interrogation or examination shall be made and a complete transcript thereof made available to such officer *** without charge and without delay."  65 ILCS 5/10-1-18.1 (West 1996); see Chicago Municipal Code § 2-84-030 (1990).  

Bagnola claims that he did not receive these written administrative warnings as required by section 10-1-18.1.  

A case on point is 
Corgiat v. The Police Board of the City of Chicago
, 155 Ill. 2d 384, 614 N.E.2d 1232 (1993), where our supreme court found that a urinalysis is not an examination under the Illinois Municipal Code (Ill. Rev. Stat. 1991, ch. 24, par. 10-1-18.1), and administrative warnings need not be issued before an officer is ordered to submit a urine sample.  
Corgiat
, 155 Ill. 2d at 391, 614 N.E.2d at 1235.  The plaintiff in 
Corgiat
 was a police officer who had been under investigation by internal affairs division of the Chicago police department ("Department") for suspected distribution of cocaine.  On two separate occasions in June of 1987, the plaintiff was asked to submit a urine specimen and he refused.  On July 30, 1987, while traveling to a hospital to admit himself to a substance abuse program, two members of the internal affairs division stopped the plaintiff and took him to the medical services section to undergo drug testing.  Again, the plaintiff refused to submit a urine sample.  As a result, the plaintiff was charged with violating police department rules and ultimately discharged by the Police Board of the City of Chicago ("Board").  
Corgiat
, 155 Ill. 2d at 386, 614 N.E.2d at 1233.  Subsequently, the plaintiff filed a petition for administrative review of the Board's decision appealing the denial of his motion to dismiss that he was not given his administrative warnings before being ordered to the Department's medical services section.  
Corgiat
, 155 Ill. 2d at 386, 614 N.E.2d at 1233.  The trial court reversed the Board's ruling, and the appellate court affirmed.  
Corgiat
, 155 Ill. 2d at 386, 614 N.E.2d at 1233.  The sole issue was whether a urine sample is an "admission" and a urinalysis is an "examination" within the meaning of the Code.  
Corgiat
, 155 Ill. 2d at 388-89, 614 N.E.2d at 1234.  Ultimately, the Supreme Court reversed both courts. 

The 
Corgiat
 court stated that the terms in a statute must be construed in the context of what they define.  
Corgiat
, 155 Ill. 2d at 389, 614 N.E.2d at 1234.  "The courts should not interpret the General Assembly legislation in an absurd or unjust manner."  
Corgiat
, 155 Ill. 2d at 389, 614 N.E.2d at 1234, citing 
Harris v. Manor Healthcare Corp.
, 111 Ill. 2d 350, 363, 489 N.E.2d 1374 (1986).  Giving an officer the right to counsel, a complete record and a transcript of the urinalysis would not aid an officer in any manner.  Really, all counsel could do is advise client to provide the sample.  
Corgiat
, 155 Ill. 2d at 390, 614 N.E.2d at 1234.  Further, the right to a complete transcript is in applicable in this case since a urinalysis cannot be recorded in a transcript.  
Corgiat
, 155 Ill. 2d at 390, 614 N.E.2d at 1234.  "Neither the officer nor the collector is required to speak, and anything they might choose to say could hardly be helpful if preserved in a paper record."  
Corgiat
, 155 Ill. 2d at 390, 614 N.E.2d at 1234.  Accordingly, administrative warnings do not have to be issued before an officer is ordered to submit a urine sample, nor will a urinalysis be considered an examination under the Code.  
Corgiat
, 155 Ill. 2d at 391, 614 N.E.2d at 1235; see 
Washington v. Police Board of the City of Chicago
, 257 Ill. App. 3d 936, 629 N.E.2d 715 (1994).  

The same issue is raised in the present case.  For this reason, we follow the well-established reasoning and the decision of our supreme court.  Administrative warnings were not required here before requesting Bagnola's urine specimen.  Having a right to counsel, a complete record and transcript of the urinalysis does not apply here.  First, in civil litigation, there is no constitutional right to counsel.  In fact, we are at a loss as to what exactly a counsel would do while an individual is merely giving a technician a urine sample.  Second, a urinalysis is testing or screening the urine sample for any foreign substance.  We do not believe a complete record or transcript is necessary, and we determine that Bagnola's arguments are senseless and his attempts to distinguish his case from the 
Corgiat
 case are unsuccessful.  Finally, we note that Bagnola was not denied due process.  Bagnola received written notice of the charges against him, and had a full adversarial hearing before the Board.  In sum, we find that Bagnola's constitutional rights were not violated nor were the Board's findings against the manifest weight of the evidence.  

In light of the foregoing, we find that the discharge of petitioner was proper under the circumstances and that there did not exist any constitutional violations.  Accordingly, we affirm the trial court's decision affirming the Board's findings.

Affirmed.

McNULTY, P.J., and RAKOWSKI, J., concur.