2020 IL App (1st) 191266
No. 1-19-1266

SECOND DIVISION
July 21, 2020

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| JACK PORTER, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 17 CH 04852 |
| | ) | |
| THE COOK COUNTY SHERIFF'S MERIT | ) | |
| BOARD; JAMES P. NALLY, in His Official | ) | The Honorable |
| Capacity as Chairman of the Cook County | ) | Anna M. Loftus, |
| Sheriff's Merit Board; BYRON BRAZIER, in His | ) | Judge Presiding. |
| Official Capacity as Vice Chairman of the Cook | ) | |
| County Sheriff's Merit Board; JOHN | ) | |
| DALICANDRO, in His Official Capacity as | ) | |
| Secretary of the Cook County Sheriff's Merit | ) | |
| Board; PATRICK BRADY, GRAY MATEO- | ) | |
| HARRIS, KIM R. WIDUP, VINCENT T. | ) | |
| WINTERS, and JENNIFER E. BAE, in Their | ) | |
| Official Capacity as Members of the Cook County | ) | |
| Sheriff's Merit Board; TOM DART, in His | ) | |
| Official Capacity as Sheriff of Cook County; | ) | |
| TONI PRECKWINKLE, in Her Official Capacity | ) | |
| as President of the Cook County Board of | ) | |
| Commissioners; and THE COUNTY OF COOK, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Lavin and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff, Jack Porter, appeals from the trial court's affirmance of the Cook County Sheriff's Merit Board's (Board) decision to terminate Porter's employment with the Cook County Sheriff's Office (CCSO) for testing positive for a cocaine metabolite. For the reasons that follow, we affirm.

¶ 2                                I. BACKGROUND

¶ 3        In May 2014, defendant Thomas J. Dart (Dart), Cook County sheriff, filed a complaint against Porter with the Board. In that complaint, Dart sought the termination of Porter's employment as a Cook County correctional officer, on the basis that Porter tested positive for benzoylecgonine, a cocaine metabolite, in violation of the rules, regulations, and general orders of the Cook County Department of Corrections (Corrections). The Board held a hearing on this complaint over the course of multiple days, during which numerous witnesses testified.

¶ 4        Lieutenant Michael Bryant of CCSO testified that in December 2013, he was assigned to External Operations, which mans Corrections' external posts, including overseeing inmates while at hospitals and their transport. At the time, he was a watch lieutenant for his shift. Porter was one of the employees that he supervised at that time, and Porter was assigned to Stroger Hospital. On December 19, 2013, Bryant was notified that Porter had been selected to submit to a random drug test. Bryant notified Porter that he had been selected, and Porter reported immediately and provided his sample.

¶ 5        Robert Dombrowski, supervisor of the CCSO's Drug Testing Unit (DTU), testified as follows. On December 18, 2013, Porter was randomly selected by a computer program to submit to drug testing, and on December 19, 2013, Porter was notified of that fact by one of the technicians in DTU. Later that same day, technician Phillip Bianco collected a specimen from

Porter. At the end of each day, all of the specimens that had been collected, including Porter's, were shipped to Pharmatech, the testing laboratory, via UPS.

¶ 6        At the time Porter submitted his specimen, an internal control number (RT number) was assigned to it by CCSO. The number assigned to Porter's specimen was RT-13-1272. Dombrowski explained that RT stood for "random test," 13 referred to the year 2013, and the last four digits referred to what number test it was CCSO had performed that year, *i.e.*, the 1272nd test performed that year.

¶ 7        Dombrowski identified Porter's test results that he received from Pharmatech via email. He acknowledged those results indicated that Porter's test identification number was RT-13-1372. It should have been RT-13-1272. Dombrowski testified that the difference was a typo and that—because Pharmatech worked off of the specimen ID number, not the RT number—the error did not affect the chain of custody. The results Dombrowski received for Porter from Pharmatech indicated that Porter tested positive for benzoylecgonine, a cocaine metabolite, but did not reflect the quantitation—or the level of the metabolite in the urine. Upon receiving that result, Dombrowski prepared a packet of paperwork and opened a case with the Office of Professional Review (OPR).

¶ 8        OPR wanted the quantitation, so Dombrowski requested that information from Pharmatech. In response, Pharmatech sent him a second report that reflected a quantitation of 3038 nanograms per millimeter. Dombrowski acknowledged that the bottom of the report said "corrected," but testified that whenever a second report is generated, it says "corrected." He also testified that when he had requested quantitations in the past, those reports indicated "corrected" on the bottom.

¶ 9    After Dombrowski notified Porter of the positive results, Porter chose to exercise his right to a retest and selected ACL Laboratories to perform the test. The results from ACL confirmed that Porter's specimen tested positive for benzoylecgonine. Dombrowski forwarded those results to OPR as well.

¶ 10    Porter provided a list of prescription medication that he was taking at the time of the test, but Pharmatech indicated that those medications were not known to cause a positive result on a test for cocaine metabolites.

¶ 11    On cross-examination, Dombrowski acknowledged that in the comments section of the testing notification form signed by Porter on the day he submitted his specimen, there was a sticker with a barcode that read, "Bottle B (split)." Dombrowski explained that on the chain of custody form, there are two pre-printed stickers that have identical barcodes on them. One sticker says Bottle A and the other says Bottle B. If the specimen were split, *i.e.*, the single specimen split into two separate bottles, the Bottle B sticker would be placed on the second bottle. In 2013, however, CCSO did not split specimens. Rather, they would place the Bottle A sticker on the specimen bottle and the Bottle B on the notification form. Thus, although the notification form had the Bottle B sticker on it that said "split," Porter's specimen was not split.

¶ 12    Phillip Bianco, a technician with DTU, testified that on December 19, 2013, he collected a urine specimen from Porter. He identified the testing notification form that he helped complete. In the comments section of that form, he placed the Bottle B sticker from the chain of custody form, which is provided to them by Pharmatech. He used the Bottle A sticker to seal the specimen bottle. The number on the barcode of the stickers was the specimen ID used by Pharmatech. Bianco testified that the "split" reference on the Bottle B sticker was there for companies that used the forms in situations where they split specimens. DTU did not split

specimens, however, so the reference on the sticker did not mean anything with relation to Porter's specimen, and their office generally just ignored the reference. Porter's specimen was not split.

¶ 13    Alfonzo Hunter, a technician with DTU, testified that on December 19, 2013, he released the specimens collected that day, including Porter's, to the UPS courier to be shipped to Pharmatech in San Diego, California. In doing so, the specimens, each sealed in their respective specimen pouches, were removed from DTU's storage refrigerator and place inside a courier bag that is specifically approved to transport specimens. The courier bag is then sealed and a preprinted airbill is placed on the courier bag.

¶ 14    Daniel Cramer, an investigator with OPR, testified that in December 2013, he was assigned the task of investigating the case against Porter. In doing so, he reviewed the documents he received from DTU, verified Porter's prescription history, learned from Pharmatech that Porter's prescription history was not the reason for the positive drug test, de-deputized Porter, took Porter's statement, and helped Porter complete the paperwork to obtain a retest. In his statement, Porter denied (1) taking any prescriptions other than the ones he disclosed, (2) ingesting or using cocaine, (3) taking any unknown pills or medications from others, or (4) believing he was being sabotaged. He could not explain why his test came back positive for a cocaine metabolite.

¶ 15    After the retest came back positive, Cramer wrote up his investigation based on the two drug tests, Porter's statement, and DTU's documentation. Based on his investigation, Cramer concluded that Porter violated the Cook County Drug-Free Workplace Policy and recommended that Porter be separated from his employment with CCSO.

¶ 16        Thomas Aucoin, the vice president of Pharmatech, testified as an expert in toxicology. Aucoin testified that, upon receiving samples for testing, they are checked into the lab, a process that includes ascertaining that the seals on the samples are intact and that all the paperwork matches the samples. At that time, each sample is assigned an internal tracking number that is used by Pharmatech to track the sample while in the lab. The RT number assigned to the sample by CCSO is recorded but not used by Pharmatech to track the sample while in the lab.

¶ 17        After Porter's sample was checked in, an initial screening test was run on a portion of the sample to screen for amphetamines, barbiturates, benzos, cocaine metabolites, marijuana metabolites, methadone, methaqualone, opiates, PCP, propoxyphene, creatinine/specific gravity, oxidizing adulterants, and pH. Aucoin explained the initial screening test as follows:

"It's an enzymatic assay, and what it does is it has antibodies to—to the drug classes.

So, for example, let's use amphetamine. If one of the tests is supposed to be for amphetamine-type compounds, the assay uses antibodies and antigens in the urine to see if there's any reactive to amphetamine-type compounds in the urine; and if it's reactive, it's considered presumptive positive, meaning that there was activity in the sample for an amphetamine-like compound, but until a confirmation's done, we don't know specifically what that compound is. So it's presumptive positive using EMIT, as you described."

Aucoin testified that to perform this test, the technician placed the sample in the instrument. The instrument read the barcode on the sample, and the computer system, based on the barcode, identified which tests to run on that sample and what cutoffs (*i.e.*, minimum drug levels to generate a positive result) to apply. Control samples were tested at the same time to ensure that the instrument's results were accurate. The instrument performed the tests, and the results were reviewed by the technician. If the results were acceptable, they were reported back to the

computer system. The portion of the sample on which this initial screen was performed was then destroyed. This initial screen on Porter's sample was positive for cocaine metabolite.

¶ 18　　Because the initial screening test on Porter's sample produced a presumptive positive for cocaine metabolite, a confirmation test was performed on the sample. To do that, another portion of Porter's sample was prepared for a gas chromatography/mass spectrometry (GC/MS) test. The prepared sample portion was then filtered. Before testing the filtered portion, the instrument was calibrated and checked against control samples. Once the instrument was calibrated, the gas chromatograph part of the instrument removed the drug components from the urine through the application of heat. The gas chromatograph then injected the drug components into the mass spectrometer, which applied electricity to the components. That electricity split up the atomic structure of the compound, which created a "fingerprint" for the component and allowed the instrument to identify the drug and the concentration of it by its chemical structure. The results of this test on Porter's sample were positive for a cocaine metabolite in the amount of 3038.34 nanograms per milliliter.

¶ 19　　Aucoin testified that the threshold/cutoff numbers for screening and confirmatory tests are set by each client. Here, the threshold for cocaine metabolites on the screening test was 300 nanograms per milliliter and 150 nanograms per milliliter on the confirmatory test. Because the 3,038.34 nanograms per milliliter found on the GC/MS test exceeded the 150 nanograms per milliliter threshold, the test was deemed positive.

¶ 20　　The initial report from the GC/MS test was generated on December 26, 2013. The report indicated that Porter's RT number was RT-13-1372 and did not include a quantitation. Aucoin reiterated that the RT number is not utilized by Pharmatech in any way, so the error in Porter's RT number had no bearing whatsoever on the test's results; it was simply a data entry error.

Aucoin also testified that the reason the report did not contain a quantitation was because of the way CCSO set up its account with Pharmatech. When each client establishes its account, it makes an election as to whether to automatically receive quantitations with the lab results.

¶ 21    The following day, December 27, 2013, a second, "corrected" report was issued. That report was labeled as "corrected" because someone had corrected the typo in the RT number and added the quantitation. The report was not corrected because there was something wrong with the test results. The results of the tests on Porter's sample were sent to CCSO.

¶ 22    Aucoin identified Pharmatech's litigation package for Porter's sample, which is kept in the ordinary course of business and consists of a compilation of paperwork that is generated, produced, or received by Pharmatech in the course of testing the sample. In that litigation package, Ken Kodama, who was the director of the Pharmatech laboratory at the time, was identified as the "Responsible Person" under federal requirements. This meant that the Substance Abuse and Mental Health Services Administration had interviewed Kodama, reviewed his education and experience, and deemed him an expert witness in the field of forensic toxicology.

¶ 23    In the litigation package, Aucoin identified a letter written by Kodama to the Assistant General Counsel of CCSO. The purpose of that letter was to explain that while putting together the litigation package, Kodama misread one of the signatures on the internal chain of custody and printed the wrong name under the signature. He initially believed the signature to belong to Zammany Kline, but later learned it was the signature of Andy Loc Ngo. Aucoin testified that this misreading did not affect the test results in any way.

¶ 24    Aucoin confirmed that Kodama had informed CCSO that, to the best of Kodama's knowledge, Porter's prescription medication would not cause him to test positive for a cocaine metabolite. Aucoin also testified that he did not know of any studies or literature that showed

that a positive cocaine metabolite test at the level Porter tested could result from ingesting airborne cocaine-based anesthetics or use of topical cocaine-based painkillers.

¶ 25    Catherine Pangco, a laboratory screener with Pharmatech, testified that on December 23, 2013, she conducted the initial screening test on Porter's sample by placing a portion of his sample on the testing instrument, waiting for the instrument to perform the testing and print the result, and providing the results to her supervisor. Porter's sample tested positive for cocaine. She also testified that she calibrates the instrument she uses for testing every day and that her supervisor reviews those calibration results.

¶ 26    Andy Loc Ngo, a GC/MS operator with Pharmatech, testified that the GC/MS machines used at Pharmatech are calibrated weekly through the use of an "autotune," which detects whether any of the machines' parameters are out of the appropriate range. To run a GC/MS test, Ngo places a tray of samples on the machine; makes sure the reagent, wash reagent, and syringe are in place; and sets the machine to run. He then waits until the machine produces the results for the control samples on the tray, so that he can be sure that the machine was operating properly. If the controls test properly, he allows the machine to continue testing the remaining samples on the tray.

¶ 27    Ngo testified that he conducted a GC/MS test on a portion of Porter's sample and that it tested positive for cocaine at 3038.34 nanograms per milliliter. He then submitted the result to Kodama for review. Ngo also testified that the signatures on the internal chain of custody form that Kodama mistook as the signatures of Zammany Kline were, in fact, his (Ngo's).

¶ 28    Judith Kay Keene, a medical technologist with ACL Laboratories (ACL), testified as an expert in toxicology. In January 2014, she was a certifying scientist and quality coordinator for ACL. That month, ACL was asked to conduct a retest on Porter's sample for benzoylecgonine.

ACL conducted a GC/MS test on it, which produced a positive result for benzoylecgonine at a level of 5,258 nanograms per milliliter. Keene testified that, although rare, it was possible to have a 2,000-nanograms-per-milliliter difference in results on a retest, especially if the sample had been frozen and the sample was not thoroughly thawed or was not mixed before a portion of it was removed, because drugs partition in strata in frozen urine.

¶ 29        Dart then rested.

¶ 30        Porter called Casandra Lewis to testify first. She testified that she was a circuit court judge in the State of Illinois and that her mother and Porter's mother were best friends. She testified that she knew Porter "reasonably well" and that he was a dutiful son to his mother, a caring and compassionate person, and a good caregiver. She also did not know him to be anything but a truthful person.

¶ 31        Drella Savage, a retired Cook County Circuit Court judge, testified that she had known Porter for 25 years, since she worked as a law clerk for Justice Blanche Manning, Porter's aunt, in the Illinois Appellate Court. She testified that Porter took care of his grandmother, uncle, and aunt when they were older. Savage knew Porter to be courteous and kind, honest, and upstanding. She heard good things from other judges regarding the work Porter performed in the courtrooms. Overall, she believed him to have a good character for honesty, integrity, compassion, being straightforward, keeping his word, and doing the things he was supposed to do when he was supposed to do them.

¶ 32        Kim Pemberton, an officer with Corrections, testified that she was Porter's partner at work for 10 years. She believed him to be honest, kind, generous, and respectful. He was a loving father and son, and she trusted him with her life. Porter was highly respected by the other officers and had a good work ethic.

¶ 33        Phillip Daniels testified that he was a retired officer with CCSO. At the time of his testimony, Daniels had known Porter for over seven years. Daniels testified that Porter was very conscientious and detailed. He was a stickler for "exact or precise things," and Daniels "wouldn't trade him for nothing in the world." When asked what Porter's reputation for truthfulness was, Daniels responded, "From everything that I know and from people that I've dealt with him, he's A-1."

¶ 34        Percy Timberlake, a correctional officer with Corrections, testified that he had known Porter for 24 years. He testified that Porter was a "stand-up guy" and a good man. He characterized Porter's reputation for truthfulness as a 9 ½ on a scale of 1 to 10.

¶ 35        John Bederka testified as an expert in toxicology. Bederka characterized Pharmatech's testing conducted on Porter's sample as "not definitive" because the litigation package from Pharmatech did not contain calibration curves for the GC/MS test. He also testified that the large difference in results between the GC/MS test performed by Pharmatech and the GC/MS test performed by ACL was, in his experience, inconsistent with the sample being the same at both Pharmatech and ACL. He testified that, typically, if the results are not within 10% of each other, one would want to examine if something had gone wrong in the chain of custody or testing process. He later testified on cross-examination, however, that although it seemed unlikely that the results would be higher in a sample that had been frozen, he could probably be proven wrong in a study.

¶ 36        Bederka then went on to opine that there was a high probability that Porter had been passively exposed to cocaine or Esterom, a drug that would produce a positive result for benzoylecgonine, while working in hospitals and being in close proximity to hospitalized inmates. Although Bederka could not say for certain whether cocaine-based drugs are utilized at

Stroger Hospital where Porter was assigned, he testified that they are commonly used in the ear, nose, and throat field of medicine.

¶ 37 Porter testified next. He testified that he had worked for the CCSO for 27 years and was, at the time of his testimony, assigned to the External Operations unit at Stroger Hospital. There, his duties included searching and securing inmates as they arrived at the hospital; escorting inmates to various clinics within the hospital, including dental, ear, nose, and throat, and same-day surgery; searching and dressing inmates following their treatment; returning inmates to holding after treatment; and providing relief to other officers. He testified that he often received multiple assignments throughout his shift and would sometimes even be assigned to a different hospital for all or part of the day.

¶ 38 During his shift on December 19, 2013, he was informed that he had been selected to submit to a random drug test. He complied and submitted a urine sample that day. On December 31, 2013, he received a phone call from Cramer, who told him that his drug test had come back positive for prescription medications. Porter informed Cramer that he took prescription medication and that he would fax a list of his medications to Cramer, which he did.

¶ 39 On January 8, 2014, Porter received a phone call, telling him that he needed to report to OPR, which he did. There, Cramer de-deputized Porter and informed him that the results of his drug test did not match the list of prescription medication he had provided and that he had tested positive for cocaine. Porter was in shock when he heard this because he did not do any cocaine or any other prohibited drugs. Cramer informed Porter that he could elect to have his sample retested, and Porter chose to do so. Pending the retest, Porter was permitted to continue working, but he was moved from Stroger Hospital to the compound outside the jail. He was later suspended.

¶ 40      Porter denied ever receiving or being shown anything that demonstrated that the initial screening test results exceeded 300 nanograms per milliliter. He also denied ever being given any information regarding the results of his retest.

¶ 41      In rebuttal, Dart called Jerrold Leikin, the director of medical toxicology for North Shore University Health Systems-OMEGA, to testify as an expert in medical toxicology. He testified that he reviewed the lab documents from Pharmatech and ACL, the complaint, OPR's file, documents provided by Bederka, and Bederka's hearing testimony.

¶ 42      Leiken testified that it was his opinion that it was not possible for a person to test positive for benzoylecgonine at the level Porter did based on absorption of cocaine through the skin, passive aerosol ingestion of cocaine, or topical Esterom use. He further testified that in his 17 years of working in emergency departments and administering medications that contained cocaine, he never once tested positive for cocaine and was never aware of any doctor who had tested positive for cocaine under such circumstances. In addition, at OMEGA, thousands of occupational urine drug tests are performed each year, and only about ten of them come back positive for cocaine. If passive ingestion of cocaine could cause a person to test positive on a drug test, Leikin would expect the number of positive cocaine tests each year to be hundreds more. Leikin testified that it was his opinion within a reasonable degree of scientific certainty that Porter used cocaine.

¶ 43      Leikin also testified that the difference in the Pharmatech and ACL GC/MS test results were not an issue of clinical concern to him because in split specimens or specimens where an additional portion was later taken for a retest, such variations could result from how the specimen is stored. In his experience, he had seen different levels reported in tests and retests.

¶ 44        He also testified that an error in the specimen donor's identification number would not be considered a "fatal flaw" that would require the test and sample to be disposed of. Such an error is not uncommon and is easily rectified. In fact, Leikin testified that he did not observe any fatal flaws in this case.

¶ 45        Cramer testified again on rebuttal. He testified that he never told Porter that he tested positive for prescription drugs. Rather, he asked Porter if Porter was taking any prescription drugs. In his initial call with Porter following the test, he informed Porter that Porter had tested positive, but did not inform him of what particular drug he tested positive for.

¶ 46        Finally, Eugene Youkilis, a toxicologist with Toxicology Resource Associates, testified as a rebuttal expert in toxicology and drug screening protocol for Porter. He testified that he reviewed the documentary evidence presented by Dart and the hearing testimony of Aucoin and Keene. He testified that the contract between Pharmatech and CCSO required that the specimens for drug testing be tested in a lab certified by the Substance Abuse and Mental Health Services Administration that meets the standards in the Mandatory Guidelines for the Federal Workplace Drug Testing Programs. Under those guidelines, laboratories are required to have a "Responsible Person," who is responsible for establishing the standard operating procedures; ensuring that the people who perform the tests have the proper qualifications, education, and experience; ensuring that specimens are stored and handled properly; and ensuring that all chain of custody and quality control programs are strictly followed.

¶ 47        He opined that proper drug screening protocol was not followed when Kodama included an addendum in Pharmatech's litigation package stating that he initially assumed a signature on the internal chain of custody to belong to Zammany Kline, but the signature actually belonged to Ngo and that, accordingly, the printed name on certain lines of the form should be Ngo's, not

Kline's. Youkilis testified that it was improper for Kodama—as lab director, certifying scientist, and Responsible Person—to assume anything and to put someone else's name on a document. As a result, Youkilis would have considered the test results to be invalid.

¶ 48    Youkilis also opined that it was a deficiency in protocol that the GC/MS test results from Pharmatech did not contain a signature indicating that they had been reviewed. Because there was no evidence that the test results had been reviewed, in Youkilis's opinion, they were invalid.

¶ 49    In addition, with respect to the discrepancy in results between the Pharmatech and ACL tests, he testified that although it is not uncommon for the levels of benzoylecgonine to increase, the 73% increase in this case was well beyond the average of 10% found in peer-reviewed studies. The increase in Porter's test results also exceeded the 30% increases he had personally observed in frozen samples. To him, that increase indicated that something was wrong in the handling and testing process.

¶ 50    Finally, he characterized the error in the RT number on the December 26, 2013, Pharmatech GC/MS test results report to be another error that, in combination with the others, raised a question with respect to the integrity of Pharmatech's handling of Porter's test. That error alone, however, did not constitute a fatal flaw.

¶ 51    On March 7, 2017, the Board issued its decision, finding that Porter had violated various provisions of Sheriff's Order 11.2.23.0 (effective date: June 28, 013), CCSO Drug-Free Workplace Policy, Sheriff's Order 11.2.20.0, and Cook County Sheriff's Department Merit Board Rules and Regulations. As a result, the Board ordered that Porter be separated from his employment with the Department effective May 20, 2014.

¶ 52    On April 4, 2017, Porter filed a complaint for administrative review in the trial court. In his brief in support of his complaint, Porter argued that the Board's decision should be reversed

because the results of the testing were not valid. According to Porter, the test results from Pharmatech were invalid because (1) there was no signature on them, confirming they had been reviewed, (2) Kodama wrote the wrong name on the internal chain of custody form, and (3) the RT number was incorrectly listed on the initial GC/MS results report. Porter also noted that there was a question of whether the GC/MS tests conducted by Pharmatech and ACL were performed on the same sample and that the UPS tracking information on the transport of Porter's sample referenced a date of November 15, 2013, but the sample was not given until December 19, 2013. Porter also argued that the admission of the Pharmatech litigation package without testimony from Kodama was erroneous because the litigation package contained the hearsay opinions and statements of Kodama. Finally, Porter pointed out that numerous witnesses had testified to his honesty and good character.

¶ 53    Porter also filed a supplemental brief in support of his complaint for administrative review. In that supplemental brief, Porter argued that the Board's decision was invalid because the Board was not lawfully constituted in that two Board members had been appointed for terms of less than six years.

¶ 54    In response, Dart argued, in relevant part, that the clerical errors in the RT number, signature on the internal chain of custody form, and UPS airbill did not affect the validity of the test results in any way. In addition, Dart argued that the Pharmatech test results were admissible under the business records hearsay exception and that even if they were not, Aucoin, as an expert, could testify to the test results as a basis for his opinion that Porter's urine contained a cocaine metabolite. Finally, Dart argued that Porter did not meet his burden of proving that the Board decision should be voided because the Board member who conducted the hearing was

properly appointed and because Porter did not demonstrate that there was not a proper quorum of four Board members who rendered the decision against him.

¶ 55        Porter's reply mostly reiterated the arguments raised in his initial brief in support of his complaint. He did, however, raise for the first time the argument that there was no evidence that Porter's sample exceeded the 300 nanograms per milliliter threshold on the initial screening test.

¶ 56        On May 10, 2018, the trial court issued an order in which it concluded that because the Board was not lawfully constituted at the time it issued its decision against Porter, remand for a new hearing was necessary. Despite this conclusion, the trial court addressed the question of whether the Board's decision was against the manifest weight of the evidence, concluding it was not. In so concluding, the trial court rejected Porter's contention that the test results were rendered invalid by (1) the incorrect RT number on the initial GC/MS results report, (2) Kodama's printing of the wrong name under Ngo's signature on the internal chain of custody form, (3) the variation in results between Pharmatech's and ACL's GC/MS tests, (4) the lack of confirming signature on Pharmatech's GC/MS results, (5) the incorrect date on the UPS airbill, and (6) the reference to a Bottle B and split sample on the drug testing notification form. The trial court also rejected the notion that Porter tested positive as a result of passive ingestion of cocaine and Porter's argument that Pharmatech's litigation package was inadmissible.

¶ 57        Porter subsequently filed a motion to reconsider, arguing that his suspension and termination were invalid because the Board was not properly constituted and because the suspension exceeded the Board's authority. Accordingly, he argued, he should be reinstated with back pay. He also argued that the trial court's conclusion that the Board's decision was not against the manifest weight of the evidence was erroneous because there was no evidence that

the results of the initial screen exceeded 300 nanograms per milliliter. On July 9, 2018, the trial court denied Porter's motion to reconsider.

¶ 58    On January 17, 2019, Dart filed a motion to reconsider. In it, he argued that the trial court's May 10, 2018, order should be reconsidered because case law issued after that order dictated a conclusion that the Board's decision was valid under the *de facto* officer doctrine. In response, Porter argued that despite the issue of whether the Board's decision was valid, there remained a lack of evidence that the initial screening results did not indicate whether the sample exceeded 300 nanograms per milliliter.

¶ 59    On May 30, 2019, the trial court granted Dart's motion to reconsider, concluding that the *de facto* officer doctrine applied and the Board's decision was valid. With respect to Porter's argument regarding the quantitation of the screening results, the trial court stated that it had already addressed and rejected this argument. Accordingly, the trial court recalled the matter from the Board, vacated that portion of the May 10, 2018, order related to the Board's composition, reaffirmed its May 10, 2018, conclusion that the Board's decision was not against the manifest weight of the evidence, and affirmed the Board's decision.

¶ 60    Porter then instituted this appeal.

¶ 61                                          II. ANALYSIS

¶ 62    On appeal, Porter argues that (1) the Board's decision was against the manifest weight of the evidence because there was no evidence presented demonstrating that the results of the initial screen exceeded 300 nanograms per milliliter, (2) Pharmatech breached drug testing protocol, and (3) the trial court erred in admitting Pharmatech's litigation package. For the reasons that follow, we affirm.

¶ 63    In administrative review cases, we review the agency's decision, not the trial court's. *Lopez v. Dart*, 2018 IL App (1st) 170733, ¶ 67. The standard of review to be applied depends upon the issues raised on appeal. Contentions related to the agency's findings of fact are reviewed under a manifest-weight-of-the-evidence standard, while the imposed punishment will be overturned only if it is arbitrary, unreasonable, or unrelated to the requirements of service. *Id.* ¶¶ 68, 75.

¶ 64    With respect to our review of factual determinations,

> "we take the agency's finding of fact as *prima facie* true and correct and will reverse a factual finding only if, after viewing the evidence in the light most favorable to the agency, we conclude that no rational trier of fact could have agreed with the agency's decision and an opposite conclusion is clearly evident. [Citations.] We will not reverse an agency's finding of fact merely because an opposite conclusion might be reasonable or we might have ruled differently. [Citation.] If the record contains evidence to support the agency's decision, we must affirm that decision. [Citation.]" *Roman v. Cook County Sheriff's Merit Board*, 2014 IL App (1st) 123308, ¶ 67.

It is the agency's job to assess the credibility of witnesses, resolve factual inconsistencies, weigh the evidence, and determine where the preponderance of the evidence lies. *Rodriguez v. Bagnola*, 297 Ill. App. 3d 906, 916 (1998). We now address each of Porter's contentions in turn.

¶ 65                        A. Manifest Weight

¶ 66    Porter first argues that the Board's finding that he violated CCSO policies against drug use was against the manifest weight of the evidence because there was no evidence of the precise quantitative results of the initial immunoassay screening and, more specifically, no evidence that the results exceeded the 300-nanograms-per milliliter threshold established by the contract

between CCSO and Pharmatech. Thus, according to Porter, the initial screen of his sample did not exceed the specified threshold, and the subsequent GC/MS test should not have been performed. We disagree that the Board's findings in this respect were against the manifest weight of the evidence.

¶ 67     Portions of the contract between CCSO and Pharmatech were introduced into evidence. These excerpts detailed the testing procedures to be followed by Pharmatech. Specifically, Pharmatech was required to first perform an initial immunoassay screening test on specimens. The contract provided the specific cutoff levels to be used in determining whether a specimen was negative for the tested-for drugs. The specified cutoff level for cocaine on the initial screening test was 300 nanograms per milliliter. Specimens that met or exceeded this level were considered positive. The contract further provided that all specimens that were identified as positive in the initial screening were to be confirmed on a GC/MS test, using the levels specified in the contract for that test. For cocaine, the cutoff level on GC/MS tests was 150 nanograms per milliliter. The contract specifically provided that "[a]ll confirmations [on the GC/MS test] shall be by quantitative analysis." No such requirement was imposed on the initial screening test. Although the GC/MS tests were required to produce quantitative results under the contract, Pharmatech was not required to report those quantitative results to CCSO unless and until CCSO requested them.

¶ 68     These contract provisions, coupled with Aucoin's testimony that the initial screening test only created a "presumptive positive," make clear that the purpose of the initial screening test was to weed out the negative specimens from those that could be positive once confirmed with further testing. To do this, the contract provided that those specimens that contained cocaine levels below 300 nanograms per milliliter on the initial screening test were considered negative,

while those that contained 300 or more nanograms per milliliter on the initial screening test were considered presumptively positive. It was irrelevant what the specific level is; the determinative factor was simply whether the level was below or above 300 nanograms per milliliter.

¶ 69    Porter does not dispute this, but instead argues that, because there was no evidence of the specific level of benzoylecgonine found on his initial screening test, the initial screening test did not meet the 300 nanograms-per-milliliter threshold and further testing should not have been performed. According to Porter, the Board's conclusion to the contrary was against the manifest weight of the evidence. We disagree. As an initial matter, the lack of a quantitative result on the initial screening test does not necessitate a conclusion that Porter's specimen contained less than 300 nanograms per milliliter of benzoylecgonine; a lack of a quantitative result simply means that the precise amount of benzoylecgonine in Porter's sample was not recorded. That question, however, does not need to be answered in order to conclude that Porter violated CCSO's rules against drug use. Rather, as discussed above, the relevant inquiry is simply whether on the initial screening test, Porter's sample contained 300 or more nanograms per milliliter of benzoylecgonine, and the record supports such a conclusion.

¶ 70    Aucoin testified that the threshold for the initial screening test and the GC/MS tests are set by the client (here, CCSO). In this case, the threshold was 300 nanograms per milliliter for the initial screening test. He further testified that when the initial screening test was performed, the sample was placed on the testing instrument. The instrument then read the barcode on the sample, and the computer system, based on the sample's barcode, identified which tests to run on that particular sample and what cutoffs to apply. Control samples were tested at the same time to ensure that the instrument's results were accurate. No evidence contradicting this testimony was presented. Based on this testimony from Aucoin, the Board could have reasonably concluded

that, because the testing instrument used the sample's barcode to identify and apply the appropriate drug cutoffs to the tests and because the instrument's accuracy was tested each time, the positive on Porter's initial screening test necessarily meant that the level of benzoylecgonine was at least 300 nanograms per milliliter. Accordingly, the Board's finding in this respect was not against the manifest weight of the evidence.

¶ 71 Although Aucoin's testimony alone is sufficient to support a finding that the positive on the initial screening test indicated that there was at least 300 nanograms per milliliter of benzoylecgonine in Porter's sample, we also note that two separate GC/MS tests performed on Porter's samples—one by Pharmatech and one by ACL—produced results that far exceeded 300 nanograms per milliliter. It would not be unreasonable for the Board to conclude that if the sample tested positive at that high of a level on GC/MS tests—the "gold standard" drug test, according to Bederka—in amounts that far exceeded 300 nanograms per milliliter, then it must also have tested positive (*i.e.*, exceeded 300 nanograms per milliliter) on the initial screening test.

¶ 72 Accordingly, we conclude that the Board's finding that Porter violated CCSO's policies on drug use was not against the manifest weight of the evidence on the basis that no evidence was presented on the specific quantitative results of the initial screening test.

¶ 73                                    B. Testing Protocol

¶ 74 Porter next argues that Pharmatech breached standard drug testing protocol in a number of ways: failing to document that the GC/MS results were confirmed by Pharmatech's Responsible Person or a certifying scientist, listing the incorrect RT number on one of the GC/MS results reports, and printing of the wrong name on the internal chain of custody form. We disagree that these alleged breaches in protocol warrant reversal.

¶ 75        As an initial matter, we note that Porter fails to place these alleged breaches of protocol within any type of legal framework or explain how or why they required the Board to reach a different conclusion. In the section of his opening brief addressing these alleged breaches, Porter simply recites the evidence that he believes supports his contentions that protocol was breached. The only legal authority that Porter cites is authority for the proposition that "[w]hen considering records generated by high-tech devices like computers, the foundation testimony must satisfy the court that the sources of information, method and time of preparation were such as to indicate its trustworthiness and justify its admission." Yet, Porter does not actually assert that the Board erred in admitting the test results on this basis. In his reply brief, Porter contends for the first time that because the test results were not confirmed by Pharmatech's Responsible Person or a certifying scientist, his punishment of termination was arbitrary and unreasonable. He does not, however, cite any authority or offer any explanation in support of his contention that the alleged breaches of protocol rendered termination an inappropriate punishment for violating CCSO's policies on drug use.

¶ 76        Ultimately, Porter's underlying contention seems to be that the alleged breaches in protocol rendered the GC/MS test results from Pharmatech invalid. Nevertheless, his failure to articulate and explain his contentions and his failure to support them with relevant legal authority are sufficient to consider these contentions waived. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (requiring that the argument section of appeals briefs "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"); *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009) (holding that "[t]he failure to assert a well-reasoned argument supported by legal authority is a violation of Supreme Court Rule 341(h)(7) [citation], resulting in waiver."); *Thrall Car Manufacturing Co. v.*

*Lindquist*, 145 Ill. App. 3d 712, 719 (1986) (stating that "[a] reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research."). Moreover, Porter's contention that his punishment was arbitrary and unreasonable as a result of the alleged breaches of protocol is also waived because he only raised it in his reply brief. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued [in the opening brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 172976, ¶ 26 ("It is well settled that a party may not raise an issue for the first time in its reply brief.").

¶ 77    Even putting aside the waiver, however, we do not believe that these alleged breaches of protocol required the Board to conclude that Pharmatech's GC/MS results were invalid or that Porter did not violate CCSO's policies on drug use. First, in his opening brief Porter claims that Pharmatech failed to document that its Responsible Person (Kodama) or a certifying scientist reviewed the GC/MS results by signing them. In his reply brief, however, Porter contends that Kodama or a certifying scientist was required to review and certify every step taken in the testing process by initialing or signing each step and then attesting to his or her review with a signature. In both instances, Porter relies on the testimony of Youkilis. The scope of the protocol Porter claims was required, however, is broader than that to which Youkilis testified. Youkilis testified that there was no signature or initials on Pharmatech's GC/MS test results to indicate that they had been reviewed and that reviewing and initialing or signing such test results was standard industry practice. He did not, however, testify that anything other than test results needed to be documented as reviewed and certified by a lab's Responsible Person or certifying scientist.

¶ 78    In addition, with respect to the review and certification of test results, Youkilis's testimony indicated that the documentation of review could appear somewhere other than on the actual test results report. Specifically, he referred to Pharmatech's chain of custody form, which included a line for "data review & disposal" and testified that there should be a signature on there to show that the results were reviewed. He also referred to ACL's "confirmation sheet" as an example of proper certification of test results review. In the case of Pharmatech's GC/MS test results, the chain of custody form did, in fact, contain the signature of Ngo on the "data review & disposal" line. We recognize that there was no evidence presented that Ngo is a Responsible Person or certifying scientist. Nevertheless, such evidence does demonstrate that Youkilis's testimony that there was no signature on that line indicating review was not entirely accurate.

¶ 79    More importantly, the first page of Pharmatech's litigation package was a document that listed Porter's specimen identification number, his RT number, the date his specimen was collected, the date Pharmatech received the specimen, the date the GC/MS results were reported, and the fact that the results of the test were positive for benzoylecgonine. Directly underneath that information was a line for Pharmatech's Responsible Person's signature. Kodama signed that line and included his printed name next to the signature. The Board could have concluded that Kodama's signature as Pharmatech's Responsible Person, directly under Porter's identifying information, relevant dates, and the GC/MS results, was intended to serve as certification of Pharmatech's positive result on Porter's sample. Given that Youkilis's testimony suggested that certification of test results could take multiple forms, we see no reason why Kodama's signature on this form did not suffice.

¶ 80    Next, Porter argues that Pharmatech breached protocol when it recorded the wrong RT number on the December 26, 2013, GC/MS results reports. The evidence at trial was that a report

of the Pharmatech GC/MS results was first issued on December 26, 2013. That report listed Porter's RT number as RT-13-1372, instead of RT-13-1272. The following day, on December 27, 2013, Pharmatech issued a corrected report, which reflected the correct RT number of RT-13-1272. Numerous witnesses testified that the RT number was assigned by CCSO was not used in any way by Pharmatech to track Porter's sample or results. Leikin testified that such an error was not uncommon, was easily rectified, and was not a "fatal flaw" that invalidated the test results. Based on this evidence, we do not agree that the Board was required to disregard Pharmatech's test results.

¶ 81　　　　We recognize that Youkilis testified that the concern with the incorrect RT number was that it could cause CCSO to report the results to the incorrect employee and that he considered this error to be a fatal flaw. As discussed above, however, the report was promptly corrected, and Leikin testified that this error was not a fatal flaw. The Board was not required to credit Youkilis's testimony over Leikin's, and we are not in a position to reweigh the evidence. See *Rodriguez*, 297 Ill. App. 3d at 916. Leikin's testimony and the evidence that the RT number was not utilized by Pharmatech and the report was promptly corrected before the results were reported to Porter is sufficient to uphold the Board's decision to credit Pharmatech's results.

¶ 82　　　　Lastly, Porter argues that Kodama "manipulated" the chain of custody when he printed the name of "Z. Kline" under Ngo's signature on the internal chain of custody form. The evidence was that Ngo signed his name on the internal chain of custody form in several places but did not print or stamp his printed name under his signature. Kodama, in reviewing the form, read Ngo's signature as belonging to another technician named Zammany Kline. Accordingly, Kodama printed "Z. Kline" under Ngo's signatures. Kodama later discovered the error and sent a letter to CCSO, clarifying that although Ngo's signature was correct, Kodama had misread the

signature and printed the wrong name underneath. Ngo confirmed during his testimony that he was, in fact, the technician that performed the GC/MS testing on Porter's sample and that he placed his signature on the chain of custody form. Leikin testified that he did not observe any fatal flaws in this case.

¶ 83     Based on this evidence, we again find no reversible error in the Board's decision to credit Pharmatech's GC/MS results. The evidence makes clear that this was not a situation where Kodama fabricated a name to insert in the chain of custody where none was present or attempted to change the signature from the correct one to someone else's to hide an error. Rather, the undisputed evidence was that Ngo, who performed the GC/MS test, signed his name on the chain of custody in the required spots. He did not, however, print or stamp his name below or next to his signature. Thus, when Kodama reviewed the chain of custody form, he misread the name and printed the incorrect one below Ngo's signature. Upon realizing his mistake, Kodama clearly addressed and corrected the issue by sending a letter to CCSO and by including the letter in the litigation package. There is no evidence of an attempt to conceal or deceive on the part of Kodama, and the correct signature was always on the chain of custody form. Accordingly, we conclude that the Board did not err in considering Pharmatech's GC/MS results.

¶ 84     Even assuming that these alleged breaches of protocol rendered Pharmatech's GC/MS results invalid, the positive GC/MS results from ACL were properly reviewed and certified, according to Youkilis, and Porter makes no arguments that ACL committed any breaches in protocol. Accordingly, the Board's determination that Porter violated CCSO policies is sufficiently supported by ACL's test results.

¶ 85                                    C. Litigation Package

¶ 86          Porter's final contention on appeal is that the Board erred in admitting into evidence

Pharmatech's litigation package pursuant to the business records exception to the hearsay rule.

Illinois Supreme Court Rule 236(a) (eff. Aug. 1, 1992) provides:

> "Any writing or record, whether in the form of any entry in a book or otherwise, made as
>
> a memorandum or record of any act, transaction, occurrence, or event, shall be admissible
>
> as evidence of the act, transaction, occurrence, or event, if made in the regular course of
>
> any business, and if it was the regular course of the business to make such a
>
> memorandum or record at the time of such an act, transaction, occurrence, or event or
>
> within a reasonable time thereafter. All other circumstances of the making of the writing
>
> or record, including lack of personal knowledge by the entrant or maker, may be shown
>
> to affect its weight, but shall not affect its admissibility."

An agency's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Wilson*

*v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 907 (2003). An abuse of

discretion occurs when no reasonable person would take the view adopted by the Board. See

*Trettenero v. Police Pension Fund of the City of Aurora*, 333 Ill. App. 3d 792, 801 (2002).

¶ 87          Aucoin testified that the documents in Pharmatech's litigation package were documents

that Pharmatech "generates or receives or produces in the process of testing the sample" and that

such documents were regularly kept in the course of Pharmatech's business. Porter does not

dispute that the documents in the litigation package were regularly kept in the course of

Pharmatech's business. Instead, he argues that they were not admissible because the business

records exception is premised on the assumption that in creating business records, "the motive

for following a routine of accuracy is great and the motive to falsify nonexistent." *Kimble v.*

*Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 414 (2005). According to Porter, in this case, the documents in Pharmatech's litigation package—primarily test results and chain of custody documents—were not accurate or valid and, thus, not admissible under the business records exception.

¶ 88    First and foremost, Rule 236(a) specifically states that all other circumstances regarding the making of documents, other than the fact that they were kept in the regular course of business and were made at the time of the event or within a reasonable time thereafter, affect only the weight to be given the records, not their admissibility. None of these contentions by Porter relate to the issue of whether the documents in the litigation package were made in the regular course of business or when the records were made. Therefore, pursuant to the explicit language of Rule 236(a), none of these contentions, even if true, have any effect on the admissibility of the documents under the business records exception. Rather, these contentions only go to the weight to be given to the litigation package documents.

¶ 89    Nevertheless, even putting that aside, we disagree that these contentions rendered the results inaccurate or invalid and, thus, the litigation package inadmissible.

¶ 90    In support of his claim that the documents in the litigation package were not accurate, Porter again argues that Kodama "perpetuated a lie, fraud[,] and breach of drug screen protocol" when he committed "the abomination of altering and manipulating the chain of custody" by printing "Z. Kline" under Ngo's signature on the internal chain of custody form. Porter also argues that the documents were inaccurate because the test results were not confirmed according to drug testing protocol. These are the same arguments Porter made in support of his independent claim that the test results were invalid, which we addressed above. For the same reasons that we rejected these contentions above, we also find that they do not warrant a conclusion that the

Board abused its discretion in admitting Pharmatech's litigation package under the business records exception.

¶ 91        Porter also argues that Pharmatech's test results were invalid because the initial GC/MS results report had the wrong RT number on it, the sticker placed on the drug testing notification form said "Bottle B (SPLIT)" when Porter only gave a single sample, the results from the retest performed by ACL were higher than the results from Pharmatech, and the UPS tracking information did not reflect the date, time, or location of the pickup of Porter's sample and instead reflected a date of November 15, 2013, when Porter did not provide a sample until December 19, 2013. None of these contentions persuade us that the Board abused its discretion in admitting the litigation package.

¶ 92        First, we have already discussed above Porter's contentions regarding the effect of the incorrect RT number. That reasoning applies with equal force here.

¶ 93        Second, Porter's contention that the sticker on the drug notification form suggests that a split sample was taken when Porter only gave a single sample is meritless. Porter asserts that he gave a single sample and every witness who testified on the matter—both for Dart and Porter—agreed. Thus, there is no dispute here as to whether he gave a single sample. More importantly, the hearing testimony clearly established that the sticker was provided on a generic form from Pharmatech. Although originally designed for situations where a single sample was split into two bottles, CCSO employees clearly testified that because they did not split samples, the sticker for Bottle A was placed on the specimen bottle, while the sticker for Bottle B was placed on the drug testing notification form for the sole purpose of utilizing the barcode, which matched the barcode on the specimen bottle. The "Bottle B (SPLIT)" language that appeared on the sticker had no meaning to CCSO or its employees. There was absolutely no evidence presented to suggest that

Porter's sample was split or that he gave more than one sample. In addition, Porter offers no argument as to how, even if his specimen was split, a split sample would affect the validity of Pharmatech's test results.

¶ 94        Next, Porter takes issue with the fact that the results from the retest performed by ACL came back significantly higher than the results produced by Pharmatech. Although Youkilis and Bederka thought such a disparity was suspicious, Leikin and Keene did not, and Keene testified that such disparities can result where the specimen is frozen and then tested without being completely thawed or thoroughly mixed. It was the Board's job to resolve this disparity, and it apparently resolved it in favor of Dart. We cannot substitute our judgment for that of the Board. See *Rodriguez*, 297 Ill. App. 3d at 916.

¶ 95        Finally, Porter complains that the UPS tracking information did not include the date, time, or location of the pick up of Porter's specimen. He further complains that the preprinted airbill listed a date of November 15, 2013, when Porter did not give his specimen until December 19, 2013. Porter does not explain how these facts render the test results invalid. Moreover, even though the UPS information does not reflect the date, time, or location of pickup, Hunter testified that UPS picked up Porter's specimen on December 19, 2013, from DTU. Moreover, DTU's affidavit reflects that the specimen was released at 5 p.m. on December 19, 2013. The UPS documentation reflects, and it is undisputed, that Porter's specimen was then received at Pharmatech on December 23, 2013. Accordingly, the fact that the UPS documents, in particular, do not list the date, time, or location of pickup is irrelevant and meaningless. Similarly, given that everyone agrees that Porter did not give his specimen until December 19, 2013, and that Pharmatech received it on December 23, 2013, the fact that the airbill—which was printed before the courier arrived to pick up the sample—read November 15, 2013, is irrelevant.

¶ 96        We note that in his reply brief, Porter for the first time on appeal, argues that the first page of the litigation package, which details the procedures followed by Pharmatech in conducting the drug tests constituted testimony by Kodama, the admission of which violated Porter's rights to Due Process to cross-examine Kodama. Because Porter did not articulate this argument in his opening brief, and instead made it for the first time in his reply, it is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued [in the opening brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); *McGinley Partners, LLC*, 2018 IL App (1st) 172976, ¶ 26 ("It is well settled that a party may not raise an issue for the first time in its reply brief."). Moreover, the same information that is found on that first page was testified to by Aucoin, whom Porter had ample opportunity to cross-examine.

¶ 97        Finally, we observe that even if Pharmatech's litigation package should not have been admitted into evidence, there remained in evidence the test results from ACL, which confirmed that Porter tested positive for benzoylecgonine. Porter has made no contention that ACL's test results were inadmissible, were invalid, or did not support a conclusion that he violated the Department's policies on drug use. Therefore, any error in the admission of Pharmatech's litigation package was harmless. See *Cairns v. Hansen*, 170 Ill. App. 3d 505, 511 (1988) ("A party is not entitled to reversal based on rulings on evidence unless the error was substantially prejudicial and affected the outcome of the trial.").

¶ 98        In sum, Porter's arguments regarding the accuracy and validity of the records in Pharmatech's litigation package go entirely to the weight to be given to the documents by the Board, not their admissibility under the business records exception. Moreover, even if they did have some relevance to assessing the admissibility of the documents, we find them to be without

merit. Accordingly, we conclude that Porter has failed to demonstrate that the Board abused its discretion in admitting Pharmatech's litigation package under the business records exception. Even if Porter had demonstrated error in its admission, that error was harmless.

¶ 99  Before closing, we pause to observe that, in this particular case, the alleged missteps in the testing procedure did not affect the validity of the Pharmatech results, were corrected, or were overcome by other evidence that Porter tested positive. This, however, will not always be the case. We caution Dart and CCSO to be diligent in attending to the details—and to expect the same from their contractors—in these situations where individuals' livelihoods are at stake.

¶ 100         III. CONCLUSION

¶ 101  For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 102  Affirmed.

**No. 1-19-1266**

| | |
|---|---|
| **Cite as:** | *Porter v. Cook County Sheriff's Merit Board*, 2020 IL App (1st) 191266 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CH-04852; the Hon. Anna M. Loftus, Judge, presiding. |
| **Attorneys for Appellant:** | Ronald A. Bobbitt, of Bobbitt & Associates, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Stephanie A. Scharf, George D. Sax, and Rebecca L. Ford, of Scharf Banks Marmor LLC, of Chicago, for appellee Thomas J. Dart.<br><br>No brief filed for other appellees. |